Opinion by Judge SCHROEDER; Partial Concurrence and Partial Dissent by Judge IKUTA.
OPINION
SCHROEDER, Circuit Judge:
Aryon Williams was convicted in Arizona state court in 1992 and sentenced to death for the first degree murder of his former girlfriend Rita DeLao, and for the later robbery and attempted murder of Norma Soto. The Arizona appellate courts upheld his convictions and sentence. See State v. Williams, 183 Ariz. 368, 904 P.2d 437 (1995). In this habeas proceeding, the most significant issues concern a claim of concealment of partially exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the failure of the state court to consider mitigating evidence at sentencing in violation of Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).
The evidence at trial included the testimony of Michelle Deloney, Williams’ then girlfriend, that Williams had confessed to her he murdered DeLao. The murder occurred in a relatively remote area of Pinal County, Arizona and there were no eyewitnesses and little physical evidence. On the robbery/attempted murder charge, the victim, Norma Soto, testified at trial and identified Williams as her attacker.
Two years after the convictions were affirmed on appeal, an Assistant Attorney General for Arizona turned over to Williams’ attorney a packet of jailhouse letters written before trial that suggested that Williams was not the actual murderer. These letters suggested that Williams had paid another man, Patrick Fields, to do the job. The jailhouse letters led Williams to two witnesses who said they had seen Fields disposing bloody clothing in a park a morning around the time of the murder. Fields turned out to have a history of assaulting women.
By the time Williams became aware of this evidence, these federal habeas proceedings had been instituted. The district court stayed the proceedings so that Williams could, in state court, exhaust a Brady claim arising from the jailhouse letters. The state court, however, refused to grant a request for a first extension of time to prepare a postconviction petition. Williams was, therefore, unable to exhaust state remedies. When he returned to federal court, the district court rejected the State’s position that the Brady claim was procedurally barred, but denied the claim on the merits. Like the district court we consider this claim without regard to the *1261 deferential strictures of the Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”). We agree with the district court that it is not appropriate to view the claim as procedurally barred because Williams did not have an opportunity to raise it in state court. The district court granted a certificate of appealability (“COA”) and we have determined that this claim warrants an evidentiary hearing.
The district court also granted a COA for the claim that the trial court violated Williams’ due process rights by failing to provide funds for a mental health expert at sentencing to establish drug dependence as a mitigating factor. Like the district court, we agree that the state court’s rejection of this claim was not contrary to or an unreasonable application of Supreme Court precedent.
Of the numerous claims that had not been certified, but that have been briefed pursuant to our rules, we find one to be meritorious. Williams offered his addiction to crack cocaine as a mitigating factor at sentencing. The Arizona Supreme Court refused to consider this as a mitigating factor under applicable Arizona law because Williams did not show he was under the influence of drugs at the time of the murder. Because Williams’ challenge to this determination raises a substantial constitutional issue, 28 U.S.C. § 2253(c)(2), we certify the issue and decide it. As we have done in other cases emanating from Arizona courts in the same period, we find that the state court erred by its refusal to consider all mitigating evidence. See Eddings, 455 U.S. at 114-15, 102 S.Ct. 869; Lockett, 438 U.S. at 604-05, 98 S.Ct. 2954; Lambright v. Schriro, 490 F.3d 1103, 1114-15 (9th Cir.2007).
FACTUAL AND PROCEDURAL BACKGROUND
The underlying facts of this case are set out in detail in the Arizona Supreme Court’s opinion on direct appeal. State v. Williams, 183 Ariz. 368, 904 P.2d 437 (1995). We summarize them here.
On Saturday, January 27, 1990, Williams and DeLao made plans to spend the night together at Williams’ apartment in Casa Grande. When DeLao called, though, Williams told her not to come over since his girlfriend Deloney was still at his apartment. DeLao came over nonetheless and had an argument with Williams outside the building. DeLao pulled a gun on Williams, but Williams was able to disarm her. Williams briefly returned to his apartment, then left it, and did not return until the following morning.
On Sunday morning, a hunter discovered DeLao’s body on a dirt road about twenty minutes from Williams’ apartment. DeLao had been shot three times and her body had suffered a number of gruesome injuries. She had been beaten, and tire tracks across her stomach indicated that she had been run over by an automobile. Bullets recovered at the scene were consistent with the gun Williams had taken from DeLao shortly before her death.
Deloney testified that Williams confessed to her on Monday that he was with several friends who killed DeLao. According to Deloney, Williams said he had only kicked DeLao, and that his friends had killed her. Williams denied ever confessing involvement in DeLao’s death. Also on Monday, Williams drove Deloney to the place where DeLao’s car had been abandoned, less than a mile from his apartment in Casa Grande. As Williams approached the car, a police officer processing the car stopped them, and Williams told the officer he thought it was DeLao’s car.
Deloney testified that, two weeks after the murder, Williams told her that he had *1262 killed DeLao, admitting that he shot her, hit her with an iron, and ran over her repeatedly with his car. Williams told Deloney that if she ever told anyone, he would kill her.
Five weeks after the murder, Norma Soto, a Circle-K convenience store clerk, was shot several times during a robbery of the store. Soto survived and identified Williams as her attacker, testifying that he shot her after telling her to stop spreading the story that he had killed DeLao. Police soon arrested Williams for both the murder of DeLao and the robbery/attempted murder of Soto.
An Arizona jury, in a consolidated trial, convicted Williams in 1992 of the murder of DeLao, armed robbery, and the attempted murder of Soto. At trial, Deloney was the State’s principal witness on the murder charge. She testified about Williams’ confessions. The State also presented evidence that, prior to the murder, Williams had burned DeLao’s car, shot at her apartment, and slashed her tires. Soto testified and identified Williams as the man who robbed the store and shot her. Williams testified in his own defense and denied any involvement in either criminal episode. Williams did not have a criminal record, although the State introduced evidence that he had abused crack cocaine and become physically abusive to Deloney. On the stand, Williams denied using drugs on the day of the murder.
At sentencing, Williams sought to have the state provide a mental health expert to explore whether his drug usage had affected his mental state when he killed DeLao. The trial court denied this motion, and the Arizona Supreme Court upheld the decision without discussion. See 904 P.2d at 450 (“Defendant also asserts ... that the trial court’s denial of funds for an expert violated his right to due process and equal protection under the law. Under the facts of this case, we reject these claims as well.”).
Williams also offered his addiction to crack as a mitigating circumstance at sentencing. The trial court refused to consider Williams’ drug use in mitigation. The Arizona Supreme Court agreed, holding that “[wjithout a showing of some impairment at the time of the offense, drug use cannot be a mitigating circumstance of any kind.” Id. at 453.
After filing two unsuccessful state post-conviction petitions in which he raised the sentencing claims of erroneous denial of a mental health expert and the refusal to consider his addiction as a mitigating factor, Williams instituted federal habeas proceedings. In 1997, while his federal petition was pending, an Assistant Attorney General for Arizona turned over to defense counsel a series of letters, and stated they were discovered “by a secretary during an annual house cleaning at the [Pinal] County Attorney’s Office.” The State said the letters had “no evidentiary value.”
The letters purported to have been written from jail in 1991, prior to Williams’ trial, by a woman named Beverly Sweat, to Detective Tom Solis, the lead investigator in the DeLao murder. In the letters, Sweat expressed the desire to provide information she had about a murder, in return for an early release from jail. Solis has denied ever having seen these letters, but has not testified or given a statement under oath to this effect.
The letters contained information Sweat allegedly obtained from a fellow inmate, Yolanda McKaney, that Williams had paid Patrick Fields to kill Rita DeLao and that McKaney had seen a bloodied Fields on one morning around the time of the murder. One letter stated that Sweat was going to have Yolanda McKaney “tell [her] the story about Rita and Patrick Fields.” *1263 The letter also noted that “Aaron” (apparently a reference to petitioner Aryon Williams) was “going to get” two people: Fields and Milton Barnett. According to this letter, McKaney told Sweat that the day of the DeLao murder, in Casa Grande, she saw Fields who was “all bloody” and who stated that “Aaron” had paid him a thousand dollars to kill DeLao. According to Sweat, Fields told McKaney that he had cut DeLao’s eyes out and run over her with a moped. Sweat also stated that she knew “Aaron is guilty of some part of it,” and in the subsequent letters, promised that she could obtain additional information, if she obtained an early release.
Counsel for Williams conducted an investigation on the basis of the Sweat letters and in 1999 obtained declarations from three people mentioned in the letters: McKaney, Barnett, and Fields. McKaney’s declaration stated that around the time of the DeLao murder, she saw Fields in a park in the small town of Casa Grande, Arizona, less than a mile from where police discovered DeLao’s abandoned car the morning after the murder. She saw a bloodied Fields throw a bloody shirt into a dumpster and burn it. Barnett stated that about this same time, and a few blocks from where McKaney saw Fields, he saw a shirtless Fields throw something into a dumpster. Barnett said that, while sharing a cigarette with Fields, he noticed blood on Fields’ clothing. Barnett asked Fields about this blood, and Fields fled. Barnett said he learned of DeLao’s murder the next day. Fields’ declaration stated he was in county jail at the time of the DeLao murder, but the State later conceded that Fields was not in custody at that time. In the district court Williams produced evidence that Fields had a history of sexual assaults against women. Williams has admitted that he knows Sweat, McKaney, Barnett, and Fields.
In 2002, the district court placed the federal proceedings in abeyance to allow Williams to exhaust a Brady claim based upon the Sweat letters and the subsequent investigation. The Arizona courts never considered the merits of this claim, however, because the Superior Court denied Williams an extension of time to file his state petition, finding that Williams had failed to show good cause under Arizona Rule of Criminal Procedure 32.4(c). The Arizona Supreme Court then summarily denied review.
Back in federal court, Williams moved for “Discovery, Expansion of the Record and [an] Evidentiary Hearing” on the Brady claim. The State opposed on the ground that this claim was procedurally barred.
The district court refused to treat the Brady claim as procedurally barred, holding in effect that the state courts had prevented exhaustion without following any well established rule that would have rendered the petition untimely. The district court noted that the State had failed to cite any case denying a first request for an extension of time in a capital case. To the contrary, Williams cited a number of examples where the state courts had granted such requests. Thus, the district court found that Rule 32.4(c) was not “firmly established and regularly followed.” See Ford v. Georgia, 498 U.S. 411, 423-24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991).
The district court also granted Williams additional discovery related to the investigation of the Sweat letters. The court declined to order an in-court hearing, finding it appropriate to consider documentation and review written evidence, rather than hear witnesses. The court said that it did so because of what it determined to be the “narrow focus” of the Brady claim.
*1264 After completion of discovery and briefing, the district court denied the Brady claim on the merits, holding that Williams was not prejudiced because the letters did not contain any material information. The court noted that none of Williams’ new information directly impeached or undercut the evidence presented at trial — evidence the jury found sufficient to convict. Rather, the district court found the letters provided further evidence that Williams was culpable by suggesting he had paid Fields to kill DeLao. The court also pointed to inconsistencies in the various declarations, noting that the fact the information originated in a jailhouse undermined its credibility.
The district court issued a COA on the Brady claim and the claim that Williams was entitled to a mental health expert at sentencing. We additionally certify the claim that addiction should have been considered a mitigating factor at sentencing.
ANALYSIS
I. The Brady Claim
First, we address as a threshold matter the State’s renewed contention that Williams’ Brady claim is procedurally barred, even though Williams was prevented from raising it because the state trial court denied him a first extension of time. In this court, as in the district court, the State has not cited to a single other instance of an Arizona court denying a first extension of time to file a habeas petition in a capital case. The State, therefore, has not shown the denial was pursuant to a well established rule against first extensions in capital cases. Procedural default must be based on the application of a well established rule. See Ford, 498 U.S. at 423-24, 111 S.Ct. 850.
Because this claim was denied in state court on an inadequate procedural ground, there was thus no failure on the part of Williams. We agree with the district court that Rule 32.4(c) was arbitrarily applied in this case. As the district court concluded “every first request for an extension of time in a capital case” had been granted previously in Arizona courts.
As a result of the state court’s arbitrary application of its rules, there is no state court decision to which this court can defer. The deference AEDPA requires for state court determinations, therefore, does not apply and our review of this claim is de novo. See Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir.2002).
A state commits a Brady violation where 1) the evidence in question is favorable to the accused, 2) the state “wilfully or inadvertently” suppressed the information, and 3) the suppression prejudiced the defendant. See Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Prejudice exists where the state suppresses “material” information; evidence is material if had it been disclosed “there is a reasonable probability ... the result of the proceeding would have been different.” Kyles v. Whitley, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (citation omitted).
The Brady materials here consist of the packet of Sweat letters that turned up in the District Attorney’s office years after trial, and led counsel to obtain the declarations of McKaney, Barnett, and Fields. See Paradis v. Arave, 240 F.3d 1169, 1178-79 (9th Cir.2001) (noting that Brady material consists of admissible evidence or inadmissible evidence that could have been used to impeach a government witness). The Sweat letters thus suggested there were witnesses who, around the time of DeLao’s murder, saw a bloodied Patrick Fields disposing of bloody clothing into dumpsters about a half a mile from where police found DeLao’s abandoned *1265 car. When defense counsel followed up on these leads after the letters were disclosed, she obtained declarations from the witnesses identified in the letters substantially reiterating this information. The Sweat letters further suggested that there might be a witness who could testify that Williams did not commit the murder himself, but paid Fields to do it.
Williams contends that this information is sufficient to justify habeas relief. The State contends, however, with some validity, that the new evidence does not undermine Deloney’s testimony that Williams confessed his involvement in the murder to her. Nor does it, according to the State, have any impact on the evidence that Williams was the last known person to be with DeLao, and that they had an argument when DeLao threatened Williams with the firearm that was used in her murder. The Sweat letters are also consistent with Williams’ first confession to Deloney that he had only kicked DeLao, and that someone else killed her. See 904 P.2d at 441. The State also points out that prior to the murder, Williams had burned DeLao’s car and shot at her house; the Sweat letters do not conflict with that evidence either.
Insofar as the letters suggest Williams was involved in the murder in a different capacity than as the actual killer, the State contends the letters suggest only an alternate theory of equal culpability, and we have held such evidence undermines a Brady claim where the new evidence fails to show the defendant was “less guilty.” See Morris v. Ylst, 447 F.3d 735, 740-41 (9th Cir.2006) (finding no Brady violation where new information “did not say Petitioner was not guilty, or that he was any less guilty” and did not suggest another party “struck” the victim).
Here, we must part company with the State’s position, because new evidence suggesting an alternate perpetrator is “classic Brady material.” Boyette v. Lefevre, 246 F.3d 76, 91 (2d Cir.2001); see United States v. Jernigan, 492 F.3d 1050, 1056-57 (9th Cir.2007) (en banc) (“Withholding knowledge of a second suspect conflicts with the Supreme Court’s directive that the criminal trial, as distinct from the prosecutor’s private deliberations, be preserved as the chosen forum for ascertaining the truth about criminal accusations.”) (internal quotation marks, citation, and brackets omitted). Not only are the Sweat letters inconsistent with the State’s theory at trial — that Williams was the only individual responsible for DeLao’s murder— but they also point to an alternative suspect who may himself have been responsible for the brutal crime.
The two witnesses mentioned in the letters, McKaney and Barnett, provided declarations that pointed only to Fields. There is also reason to believe the declarations from Barnett and McKaney are more reliable than the Sweat letters. Sweat prepared the letters in hopes of obtaining an early release from jail, and thus had every motivation to tell the police what she thought they wanted to hear. Barnett and McKaney, in contrast, had no apparent motivation to sign a false declaration implicating Fields. Williams has also provided a plausible explanation that the statement in the Sweat letters that he was “going to get” Fields was unrelated to the murder. Williams believed Fields was responsible for the violent assault of one of his longtime friends.
Fields is at least a plausible alternative suspect: he had a history of violence against women and lied about being in jail at the time of the murder. McKaney and Barnett both saw Fields disposing of bloody clothing around the time of the murder and a short walk away from where police discovered DeLao’s abandoned car. *1266 Williams, Fields, Barnett, and McKaney all knew one another and lived in the same small town. Juror affidavits suggest that at least one juror reluctantly voted to convict on the basis on the evidentiary record. There was also little physical evidence connecting Williams to the crime. This lends materiality to new evidence that someone else was involved — and possibly solely responsible. See Jernigan, 492 F.3d at 1054 (considering the strength of the prosecutor’s case in weighing the materiality of suppressed evidence); Gantt v. Roe, 389 F.3d 908, 913 (9th Cir.2004) (holding that newly discovered information is material when it undermines a conviction based upon little physical evidence).
The Sweat letters thus provided the government with information concerning a possible alternative suspect that, if disclosed to the defense, would have allowed Williams to decide whether to put McKaney and Barnett on the stand to testify. We have recognized the principle that the government may not, consistent with Brady, suppress information that another person committed the crime for which the defendant is on trial. See Jernigan, 492 F.3d at 1056-57.
The Sweat letters also provided the names of two potential witnesses that could have testified to events that undercut the prosecution’s theory that Williams was the lone assailant. Rather than focusing on the information in the letters, and the potential materiality of the witnesses’ testimony that might implicate another perpetrator, the district court prematurely deemed these two witnesses presumptively not credible on the basis of inconsistencies in their declarations. Yet, the two declarations were executed in 1999, nine years after the murder. Given this fact, some inconsistencies do not necessarily make their stories wholly incredible. More important, “[w]hen analyzing a Brady claim, we do not reweigh evidence [or] assess the credibility of witnesses [to] decide whether the suppressed evidence establishes the guilt of a third party beyond a reasonable doubt or exonerates petitioner.” Scott v. Mullin, 303 F.3d 1222, 1232 (10th Cir.2002) (internal quotation marks, citation, and brackets omitted). The critical question is whether the suppressed Brady material could have provided material evidence that may have changed the result. The district court concluded on the basis of written statements alone that Barnett and McKaney were inherently unbelievable witnesses. The court did so without holding an in-court evidentiary hearing in order to determine whether they would have been able to provide material evidence that may have changed the result of Williams’ trial. This was error. We follow our opinion in Earp v. Ornoski, 431 F.3d 1158, 1169-70 (9th Cir.2005).
In Earp, also a death penalty case, we stressed that credibility should be assessed on the basis of an in-court hearing where the judge can see and hear the witnesses. See id. There, as here, the district court had resolved a habeas claim on the basis of written declarations and we held that to be error. See id. We stated that “[b]ecause the veracity of the witnesses who signed the affidavits on which Earp based his claim was at issue, the claim could not be adjudicated without an evidentiary hearing on this disputed issue of material fact.” Id. at 1170.
We are similarly unable to determine on this limited record, whether there is a “reasonable probability” of a different result at trial had this information been available. See Kyles, 514 U.S. at 433, 115 S.Ct. 1555. Although there are many questionable aspects in the statements and their sources, this is a capital case in which courts’ responsibility to ensure that due process was afforded the defendant is criti *1267 cal in order to prevent the execution of an individual in the face of evidence that might show him innocent of the crime of conviction. See Burger v. Kemp, 483 U.S. 776, 785, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (“Our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.”). The district court abused its discretion in determining these issues on the basis of the documentary evidence alone. This case is not one of the “rare instances” where “credibility may be determined without an evidentiary hearing.” See Earp, 431 F.3d at 1169-70.
The dissent states that Williams is not entitled to an in-court evidentiary hearing on his Brady claim because he “actively opposed one” in the district court. (Dissenting Op. at 1278.) This is not an accurate description of the record. Williams expressly moved for an evidentiary hearing on his Brady claim, and the district court found he had satisfied AEDPA’s strict requirements for obtaining one. See 28 U.S.U § 2254(e)(2). The State then argued that the district court should summarily deny the claim without holding an evidentiary hearing because Williams had not shown that he was unaware of the information about Fields in the Sweat letters and the letters were not credible. Alternatively, the State requested an evidentiary hearing so that it could conduct discovery and develop evidence related to Williams’ and Williams’ counsel’s knowledge of Field’s alleged participation in the murder, and cross-examine Sweat, McKaney, and Barnett to investigate the inconsistencies between the letters and the declarations. At that point, Williams opposed the State’s attempt to use an evidentiary hearing to conduct investigatory discovery when the court had previously granted the State a five-month extension to investigate these matters, and it had failed to do so. We do not view this course of events as active opposition to an in-court evidentiary hearing, and disagree with the dissent’s conclusion that Williams invited error by “express[ly] disavowing]” an in-court hearing.
We also disagree with the dissent’s conclusion that the Sweat letters could not have been material to the guilt phase of Williams’ trial because the letters were not exculpatory. (Dissenting Op. at 1275-76.) As the dissent recognizes, the standard for materiality is whether “there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” Kyles, 514 U.S. at 433, 115 S.Ct. 1555 (citation omitted). The dissent contends that because Sweat claimed in her letters that Williams had paid Fields to kill DeLao, and under Arizona law a person could be convicted of first-degree murder if he hired someone else to commit a homicide, the Sweat letters could not have provided evidence that would have exculpated Williams from culpability for DeLao’s murder. But if the account of events provided by McKaney and Barnett in their declarations is accurate, it is not altogether clear that Williams was involved in DeLao’s murder at all. For that reason, an in-court evidentiary hearing was needed so that the district court could assess the credibility of these witnesses and determine whether there was a reasonable probability the result at the guilt phase of Williams’ trial would have been different had the State disclosed the Sweat letters in a timely fashion.
The dissent faults us for considering the McKaney and Barnett declarations in our analysis of whether the Sweat letters are material. (Dissenting Op. at 1279.) This contention, however, is premised on the faulty assumption that the prosecution could not have known that the information in the Sweat letters was material. Clear *1268 ly, a reasonable prosecutor would have known that the Sweat letters, which identified two new witnesses and an alternative suspect, could lead to evidence material to Williams’ culpability for the murder of DeLao. The declarations confirm that is so, by indicating that the witnesses were available and possessed material information which may have exculpated Williams. The Supreme Court has explained that a prosecutor who has any doubt about the materiality of a piece of evidence favorable to the defendant should disclose the evidence. Kyles, 514 U.S. at 439, 115 S.Ct. 1555 (“[A] prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence.”); United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (“[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure.”). It is therefore appropriate to consider the declarations of McKaney and Barnett, and any testimony they may provide at an evidentiary hearing on remand, to determine whether the State’s suppression of the Sweat letters violated Williams’ due process rights under Brady.
We hold the district court erred by not further developing the factual record of the Brady claim. It would be improper to dismiss the possibility that Williams was denied access to information tending to implicate the guilt of another in the perpetration of this heinous crime. We thus remand this Brady claim in order for the district court to decide, on the basis of an appropriate record, whether there were witnesses who could have provided material evidence favorable to Williams at trial. After hearing any available testimony from McKaney, Barnett, Fields, Solis, and Sweat, the district court will be in a better position to assess whether this newly discovered evidence undermines the jury’s verdict, and whether the government violated the Brady principle in failing to inform Williams about it before trial.
II. Williams’ Request for a Mental Health Expert to Present Mitigating Evidence
Williams next contends the state court unreasonably applied Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), when it denied him psychiatric assistance at sentencing to present mitigating evidence related to his crack cocaine usage. Because Williams failed to make our required threshold showing that his mental state was in issue, we reject this claim.
The Supreme Court in Ake held that due process requires the state to provide an indigent defendant funds for psychiatric assistance when he makes a preliminary showing that his mental state was a significant factor at the time of the offense. 470 U.S. at 83, 105 S.Ct. 1087. The Arizona Supreme Court did not explain its reasoning in rejecting Williams’ Ake claim. We therefore independently review the record, but only, as required by AEDPA, may grant relief if the state court unreasonably applied controlling federal law as determined by the Supreme Court. See Pirtle, 313 F.3d at 1167.
The district court denied the Ake claim in this case on two bases. First, the district court noted that other circuits have interpreted Ake to require a state to provide a defendant expert psychiatric assistance at sentencing only where the state also planned to rely on psychiatric testimony. See Mason v. Mitchell, 320 F.3d 604, 616 (6th Cir.2003). Yet, we have never read Ake so narrowly. See Hoffman v. Arave, 455 F.3d 926, 934 (9th Cir.2006) (“[In Ake ], the Supreme Court held that where an indigent defendant can demonstrate that his mental capacity is likely to be a ‘significant issue’ at trial or capital sentencing, he has an absolute right to be *1269 provided with psychiatric and psychological expert assistance.”), vacated in part on other grounds, 552 U.S. 117, 128 S.Ct. 749, 169 L.Ed.2d 580 (2008); Ronald Williams v. Stewart, 441 F.3d 1030, 1049 (9th Cir.2006) (per curiam); Smith v. McCormick, 914 F.2d 1153, 1157 (9th Cir.1990).
The district court also ruled that Williams had himself failed to make a sufficient threshold showing that his mental state was at issue at the time of the murder, because there was so little in the record to indicate, that due to drug use, Williams’ mental state was impaired. The district court granted a COA. We affirm on the latter ground.
Before triggering Ake’s due process right to psychiatric assistance, a defendant must “demonstrate!] to the trial judge that his sanity at the time of the offense is to be a significant factor.” Ake, 470 U.S. at 83, 105 S.Ct. 1087. The defendant in Ake made this threshold showing for the trial phase by relying on an insanity defense. Id. at 86, 105 S.Ct. 1087. In addition, he had exhibited “bizarre” behavior at arraignment, and established that he required heavy medication to control his illness. Id. A competency examination revealed his illness had begun years earlier. Id. At sentencing the prosecution sought to prove, as an aggravating factor, that the defendant posed a future danger. Id. The defendant then placed his mental state at issue at sentencing by relying upon the trial testimony of a psychiatrist that because of mental illness he posed a future danger. Id. He requested the court to appoint an expert to assist at the capital sentencing phase and the Supreme Court ultimately agreed he was entitled to one. Id. at 86-87,105 S.Ct. 1087.
Williams’ initial showing, in contrast, was weak. His defense at trial was not insanity or diminished capacity, but that he did not do it. He contends he put his mental state at issue at sentencing through Michelle Deloney’s trial testimony that he used crack the day before the murder, and through other testimony that a violent change in character coincided with his starting to use drugs. Applying the required level of deference, we find that it was not “objectively unreasonable” for the state courts to determine this was an insufficient threshold showing. Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); 28 U.S.C. § 2254(d)(1), (2). Even with Deloney’s testimony, there was little evidence that Williams’ drug use had in fact affected the crime. For example, there was no evidence of bizarre behavior exhibited by Williams at the time of the offense. See Ronald Williams, 441 F.3d at 1048-50 (holding that a defendant who did not rely on an insanity defense, had been found competent, and failed to exhibit “bizarre” or “psychotic” behavior failed to put his mental state at issue); see also James v. Gibson, 211 F.3d 543, 554 & n. 5 (10th Cir.2000) (holding that the defendant had not made a sufficient showing that his mental state was at issue at the time of a murder even though there was evidence that at one point he had suffered from a mental disorder). Petitioner thus made no showing that drugs impaired his mental state “at the time of the offense.” See Ake, 470 U.S. at 83, 105 S.Ct. 1087.
The dissent incorrectly suggests that whether a defendant has placed his mental state at issue is irrelevant at sentencing. (Dissenting Op. at 1279-80.) The Court in Ake made clear that a defendant must show that his mental state was a “significant factor” at both the guilt and penalty phases. See id. at 83-84, 105 S.Ct. 1087.
We thus affirm the district court’s denial of Williams’ Ake claim. The trial court was not required to appoint a mental *1270 health expert at sentencing because the defendant did not make any showing that his mental state at the time of the murder was at issue by virtue of drug use.
III. Drug Use as a Mitigating Circumstance
Williams also asked the sentencing court to treat his drug use as a mitigating factor. The trial court refused and he contends the Arizona Supreme Court improperly required a direct causal nexus between his drug use and the murder before it would afford the drug use any mitigating weight at sentencing. This claim has merit, because the Supreme Court has repeatedly held no such nexus is required in capital cases. See, e.g., Tennard v. Dretke, 542 U.S. 274, 284-87, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004).
Although Williams had denied drug use during the" guilt phase of the trial, he presented drug use as a mitigating factor at sentencing through the testimony of Deloney and a friend, Raymundo Mendez. Deloney testified that Williams was a nonviolent person up until the time he started to abuse crack. She stated that once he started to abuse drugs he became progressively more violent. Mendez testified that he had known Williams most of his life. He said Williams initially had a reputation as a quiet and peaceful person. He also testified that about the time Williams became known as a drug user, that he became violent and started carrying guns with him. Williams did not testify at his sentencing hearing.
The state trial court ruled that Williams failed to establish his drug use as a mitigating factor because it found “there was no evidence, including considering [Williams’] own testimony, to indicate that cocaine usage by [Williams] was a factor in the perpetration of the murder.” The Arizona Supreme Court affirmed this ruling on direct appeal. The court stated that, under Arizona law, “[w]ithout a showing of some impairment at the time of the offense, drug use cannot be a mitigating circumstance of any kind.” 904 P.2d at 453. The court thus refused to consider this mitigating circumstance because Williams “offered no evidence showing that he was intoxicated when he murdered [DeLao].” Id.
The district court considered and rejected this claim on the merits, holding the state court was not required to consider Williams’ drug use as a mitigating circumstance. The district court declined to issue a COA, but the issue, at the very least, is one upon which reasonable jurists could disagree. See Miller-El v. Cockrell, 537 U.S. 322, 327, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). We therefore certify this issue and consider its merits.
We may reverse only if the Arizona Supreme Court’s decision was contrary to clearly established federal law. See 28 U.S.C. § 2254(d)(1). The federal law is clear that a sentencing court must consider all mitigating evidence. The decision of the Arizona Supreme Court that drug use could not be considered as a mitigating factor “of any kind,” is contrary to the Supreme Court’s consistent decisions in capital cases beginning more than a decade before Williams’ trial. See Smith v. Texas, 543 U.S. 37, 45, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004); Tennard, 542 U.S. at 284-87, 124 S.Ct. 2562; Eddings, 455 U.S. at 114-15, 102 S.Ct. 869; Lockett, 438 U.S. at 604-06, 98 S.Ct. 2954.
The Lockett plurality in 1978 struck down an Ohio statute that allowed courts to consider only specified mitigating factors. 438 U.S. at 597, 609-11, 98 S.Ct. 2954. The Court held that “in all but the rarest kind of capital case, [the sentencer should] not be precluded from considering, *1271 as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.” Id. at 604, 98 S.Ct. 2954.
A court majority in Eddings extended Lockett and held that an Oklahoma court violated the Constitution when it refused to consider evidence of a defendant’s abusive childhood. 455 U.S. at 113, 102 S.Ct. 869. The Court stated that a trial court “may determine the weight to be given relevant mitigating evidence [but that it] may not give it no weight by excluding such evidence from [its] consideration.” 455 U.S. at 114-15, 102 S.Ct. 869.
In Tennard, the Court rejected a Fifth Circuit test that barred the consideration of mitigating evidence unless “the criminal act was attributable to this severe permanent condition.” 542 U.S. at 283, 124 S.Ct. 2562. The Court held that “a State cannot bar the consideration of ... evidence if the sentencer could reasonably find that it warrants a sentence less than death.” Id. at 285, 124 S.Ct. 2562 (internal quotation marks and citation omitted).
In Smith the Court explicitly rejected a Texas court’s refusal to consider mitigating evidence unless there was a “nexus” between the mitigating circumstance and the murder. 543 U.S. at 45, 125 S.Ct. 400. The Court found that such a “nexus test” was a “a test [it had] never countenanced and now ... unequivocally rejected.” Id. Tennard and Smith are retroactively applicable. See Schad v. Ryan, 606 F.3d 1022, 1045 (9th Cir.2010) (per curiam) {“Tennard and Smith are retroactively applicable to the Arizona Supreme Court’s ... decision in this case.”); see also Styers v. Schriro, 547 F.3d 1026, 1035-36 (9th Cir.2008) (applying Smith retroactively).
At the time of Williams’ trial, Arizona courts recognized a nexus test similar to those rejected in Tennard and Smith. See, e.g., State v. Djerf 191 Ariz. 583, 959 P.2d 1274, 1289 (1998) (“The trial court considered the evidence but found it irrelevant and declined to give it weight because proof was lacking that [the defendant’s] family background had any effect on the crimes.”). This court has repeatedly ordered habeas petitioners resentenced when the death penalty rested upon Arizona courts’ use of this unconstitutional test. See, e.g., Lambright, 490 F.3d at 1114-15; Styers, 547 F.3d at 1035-36.
The Arizona Supreme Court made the same error in this case and we must reach the same result. By holding that “drug use cannot be a mitigating circumstance of any kind” unless Williams demonstrated “some impairment at the time of the offense,” the Arizona Supreme Court imposed a “nexus” requirement contrary to Eddings, Lockett, Tennard, and Smith. The Arizona courts had discretion as to the weight to be given Williams’ drug addiction, but erred by refusing to consider it at all unless he proved it was a factor in the crime. We thus vacate the death sentence, reverse, and remand for issuance of a writ of habeas corpus. “Further sentencing by the state court shall be conducted in conformance with applicable law.” Lambright, 490 F.3d at 1128.
IV. Williams’ Remaining Claims
Williams’ brief to this court raised a number of issues the district court declined to certify. The district court found these issues procedurally barred and did not consider them on the merits. We have reviewed the district court’s decision and reviewed the record and decline to certify any additional issues.
CONCLUSION
We vacate the judgment of the district court denying the petition and remand for *1272 an in-court evidentiary hearing on the petitioner’s Brady claim challenging the conviction. We also remand with instructions to grant the petition on petitioner’s claim of denial of due process at sentencing for failure to consider all mitigating circumstances. We otherwise affirm the denial of relief.
AFFIRMED in part, VACATED in part, and REMANDED.