**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES ERIN MCKINNEY,
  *Petitioner-Appellant*,

v.

CHARLES L. RYAN,
  *Respondent-Appellee*.

No. 09-99018

D.C. No.
2:03-cv-00774-DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
December 6, 2012—Pasadena, California

Filed September 16, 2013

Before: Kim McLane Wardlaw, Carlos T. Bea,
and N. Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith;
Partial Concurrence and Partial Dissent by Judge Wardlaw

## SUMMARY[*]

### Habeas Corpus/Death Penalty

The panel affirmed the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition challenging a murder conviction and capital sentence.

The panel held that the use of dual juries, one for petitioner and one for his co-defendant, did not violate clearly established federal law, despite petitioner's claim that this method led to a prejudicial courtroom layout where petitioner sat facing the jurors throughout trial. The panel held that petitioner procedurally defaulted on his other dual juries challenges.

The panel held that petitioner procedurally defaulted on his claim that the trial court violated his rights by requiring him to wear a leg brace during trial.

The panel rejected petitioner's claim, under *Lockett v. Ohio*, 438 U.S. 586 (1987), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), that the trial court did not adequately consider mitigating factors in imposing the death penalty, explaining that these cases only hold that a sentencer must fully consider proffered mitigating evidence, and do not affect a sentencer's determination of the weight of the evidence.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Judge Wardlaw concurred in part and dissented in part. She agreed with the majority's conclusion that the denial of relief as to petitioner's dual juries and shackling claims must be upheld for failure to exhaust them. However, she disagreed with the majority's analysis of the *Eddings* claim, and would reverse the district court's denial of relief and instruct that court to grant the petition as to that claim.

## COUNSEL

Ivan K. Mathew (briefed and argued) and Susan T. Mathew (briefed), Mathew & Associates, Phoenix, Arizona, for Petitioner-Appellant.

Jon G. Anderson, Assistant Attorney General, Capital Litigation Division, Phoenix, Arizona, for Respondent-Appellee.

## OPINION

N.R. SMITH, Circuit Judge:

Petitioner James Erin McKinney, an Arizona state prisoner, appeals the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition. The Arizona state court sentenced McKinney to death on each of two counts of first-degree murder for the 1991 killings of Christene Mertens and Jim McClain. We affirm the district court.

In this opinion we address three claims raised in McKinney's petition: (1) the trial court's use of dual juries at trial; (2) the trial court's use of a leg brace as a security

measure during trial; and (3) whether the sentencing judge properly considered all mitigating evidence under *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982).[1]  McKinney failed to exhaust each of these claims except one of his several dual juries claims and the *Lockett*/*Eddings* claim.  McKinney's unexhausted claims are procedurally defaulted, because he would now be barred from raising them to the Arizona state courts.  *See Beaty v. Stewart*, 303 F.3d 975, 987 (9th Cir. 2002) (citing Ariz. R. Crim. P. 32.2(a)).  As to the remaining claims, the Arizona Supreme Court's decision to deny relief was not contrary to, nor an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts before that court.  *See* 28 U.S.C. § 2254(d).

## FACTS AND PROCEDURAL HISTORY

## A.  Background[2]

On February 28, 1991, McKinney and his half brother, co-defendant Michael Hedlund, committed the first in a string of five residential burglaries.  Before this first burglary,

---

[1] McKinney raises other uncertified claims on appeal.  Because McKinney has not shown that the district court's resolution of the other claims is "debatable amongst jurists of reason," *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003), we decline to expand the certificate of appealability to review the claims.  *See* 28 U.S.C. § 2253(c); *Hiivala v. Wood*, 195 F.3d 1098, 1102–04 (9th Cir. 1999) (per curiam).

[2] These facts are drawn substantially from the Arizona Supreme Court's opinion in *State v. McKinney*, 917 P.2d 1214, 1218–19 (Ariz. 1996) (en banc), *superseded by statute on other grounds as stated in State v. Martinez*, 999 P.2d 795, 806 (Ariz. 2000) (en banc).  We presume the correctness of the Arizona court's findings unless rebutted by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).

McKinney and Hedlund (collectively, "Defendants") were driving in Hedlund's car with Chris Morris and Joe Lemon, discussing potential targets. Brandishing his gun, McKinney stated that he would shoot anyone that they found at home during the burglaries. Hedlund said that he would beat anyone that he encountered in the head.

At the time, Defendants had learned from Morris and Lemon that Christene Mertens supposedly kept thousands of dollars in an orange juice container in her refrigerator. Therefore, Defendants and Morris and Lemon intended to burglarize Mertens's home on the first night of the burglary spree. However, Mertens came home and scared the would-be burglars away. As a result, the four of them chose a different house to burglarize, but obtained nothing of value from the burglary.

The next night, McKinney, Hedlund, and Morris committed two more burglaries. Lemon was not involved. McKinney and Morris stole a .22 revolver, twelve dollars, some wheat pennies, a tool apron, and a Rolex watch—splitting the "proceeds" with Hedlund after the crimes. When the homeowner returned home during the third burglary, McKinney and Morris ran away, leaving the homeowner unharmed. However, after the burglary, McKinney remarked that he and Morris "should have stayed and [McKinney] would have shot [the homeowner]."

On March 9, 1991, McKinney and Hedlund returned to the Mertens home for the fourth burglary. When they entered the residence, Defendants found Mertens home alone and attacked her. After the attack Mertens had both gunshot and stab wounds. However, the medical examiner certified the cause of death as "a penetrating contact gunshot wound to the

head." Defendants ransacked the house and stole $120 in cash.

Defendants committed the fifth burglary and second murder at the home of Jim McClain on March 22, 1991. Defendants knew McClain, because Hedlund had bought a car from him about six months before the murder. McClain's house was ransacked during the course of the burglary, and he was shot in the back of the head while sleeping. Defendants stole a pocket watch, three handguns, and McClain's car. Defendants later tried to sell the stolen guns.

McKinney was tried on two counts of first degree murder, two counts of burglary, one count of theft, and one count of attempted theft. The trial court tried Defendants together, but empaneled separate juries to decide the guilt of each Defendant. The trial court required both Defendants to wear a leg brace as a security measure throughout the trial. McKinney's jury found him guilty of all charges, except the attempted theft charge. The trial judge sentenced McKinney to death on each first degree murder conviction. *State v. McKinney*, 917 P.2d 1214, 1218 (Ariz. 1996) (en banc), *superseded by statute on other grounds as stated in State v. Martinez*, 999 P.2d 795, 806 (Ariz. 2000) (en banc).

## B. Post-conviction proceedings

The Arizona Supreme Court upheld McKinney's convictions and sentence on direct appeal. *McKinney*, 917 P.2d at 1234.

McKinney thereafter challenged his convictions and sentence in post-conviction collateral proceedings. The Maricopa County superior court (the "State PCR Court")

concluded that none of the claims raised in McKinney's operative petition for post-conviction relief (the "PCR Petition") presented material issues of fact or law to warrant further proceedings. The State PCR Court summarily dismissed the petition. McKinney appealed the dismissal of the PCR Petition to the Arizona Supreme Court, which denied review on all claims relevant to this appeal.

Thereafter, McKinney raised 26 claims in his petition for writ of habeas corpus to the U.S. District Court for the District of Arizona. The district court denied relief on a number of these claims in 2006 and on the remaining claims in 2009. In its order denying relief, the district court granted a certificate of appealability ("COA") on the issues of whether the trial court's use of dual juries or a leg brace violated McKinney's rights. The district court denied a COA on the remaining issues.

## STANDARD OF REVIEW

"We review *de novo* the district court's decision to grant or deny a petition for a writ of habeas corpus." *Rhoades v. Henry*, 598 F.3d 495, 500 (9th Cir. 2010).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this case. *See Lindh v. Murphy*, 521 U.S. 320, 336–37 (1997); *Lopez v. Schriro*, 491 F.3d 1029, 1036–38 (9th Cir. 2007). A petitioner must overcome a high threshold to obtain relief under AEDPA:

> Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision was contrary to federal law then clearly

established in the holdings of [the Supreme]
Court, § 2254(d)(1); or that it involved an
unreasonable application of such law,
§ 2254(d)(1); or that it was based on an
unreasonable determination of the facts in
light of the record before the state court,
§ 2254(d)(2).

*Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 785
(2011) (internal quotation marks and citation omitted).

The "*only* definitive source of clearly established federal
law under AEDPA is the holdings (as opposed to the dicta) of
the Supreme Court as of the time of the state court decision."
*Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003),
*overruled on other grounds by Lockyer v. Andrade*, 538 U.S.
63 (2003)). If Supreme Court "cases give no clear answer to
the question presented, . . . it cannot be said that the state
court unreasonably applied clearly established Federal law."
*Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (internal
quotation marks omitted). In other words, "'[i]t is not an
unreasonable application of clearly established Federal law
for a state court to decline to apply a specific legal rule that
has not been squarely established by [the Supreme Court].'"
*Richter*, 131 S. Ct. at 786 (quoting *Knowles v. Mirzayance*,
556 U.S. 111, 122 (2009)).

In cases where a petitioner identifies clearly established
federal law and challenges the state court's application of that
law, our task under AEDPA is not to decide whether a state
court decision applied the law correctly. *See id.* at 785.
Rather, we must decide whether the state court decision
applied the law reasonably. *See id.* ("'[A]n *unreasonable*
application of federal law is different from an *incorrect*

application of federal law.'" (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). If the state court applied the law reasonably, we must deny relief. *See id*. Thus, we grant relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Id.* at 786.

## DISCUSSION

### I. Dual Juries Claims

McKinney raises a number of claims based on the trial court's use of dual juries. However, McKinney exhausted[3] only one of them in the state courts, as AEDPA requires—his claim that the use of dual juries led to a prejudicial courtroom layout where McKinney sat facing the jurors throughout trial. McKinney's "courtroom layout" claim fails, because he has failed to identify clearly established federal law that would provide the basis for relief under § 2254(d)(1). McKinney failed to exhaust any of the other potential dual juries claims and would now be barred from raising these claims in state court. *See Beaty*, 303 F.3d at 987 (citing Ariz. R. Crim. P. 32.2(a)). Accordingly, McKinney's "other" dual juries

---

[3] The exhaustion doctrine requires a petitioner to provide the state courts with the opportunity to rule on his federal constitutional claims before presenting these claims to a federal habeas court. *See King v. Ryan*, 564 F.3d 1133, 1138 (9th Cir. 2009); 28 U.S.C. § 2254(b)(1) (proving that a writ of habeas corpus shall not be granted unless "the applicant has exhausted the remedies available in the courts of the State").

claims are procedurally defaulted,[4] and he has not shown cause or prejudice to excuse the default. *See id.*

## A.  Background and procedural history

Before trial, Hedlund moved to sever his case from McKinney's, and the State did not oppose the motion. The trial court initially granted the motion to sever. The trial court later asked the parties for briefing on the idea of using dual juries.

Thereafter, the trial court held a hearing on the use of dual juries. The State opposed the practice based on a perceived state procedural obstacle set forth in *State v. Lambright*, 673 P.2d 1 (Ariz. 1983) (en banc), *overruled by Hedlund v. Sheldon*, 840 P.2d 1008 (Ariz. 1992) (en banc). McKinney shared the State's *Lambright* concern and argued that it would be improper for the court to employ an untested dual jury procedure. McKinney also argued that severance was required to avoid the introduction of impermissible, incriminating testimony under *Bruton v. United States*, 391 U.S. 123 (1968).

The trial court concluded that the use of the dual juries would not impede Defendants' right to fair trial, and found no inherent prejudice in the use of dual juries. At trial, both

---

[4] A state prisoner procedurally defaults federal claims if he fails to raise them as federal claims in state court or if, in raising the claims, he fails to comply with applicable state procedural rules. *Coleman v. Thompson*, 501 U.S. 722, 730–31 (1991). The state can successfully assert a procedural default defense to federal habeas review unless the prisoner can show both "cause" for the procedural default and actual prejudice, or the prisoner demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice. *Id*. at 750.

Defendants' juries were present in the courtroom, except during "the reading of charges, opening statements, closing arguments, and testimony related to a particular defendant's inculpatory statements." Both before and during trial, the trial court reminded counsel to preserve the integrity of the dual jury procedure and to avoid eliciting testimony non-admissible against the other codefendant under *Bruton*.

Before trial, McKinney challenged the use of dual juries in a special action to the Arizona Court of Appeals. *See Hedlund*, 840 P.2d at 1009. The court of appeals reversed, holding that the trial court exceeded its authority under the Arizona Rules of Criminal Procedure and the Arizona Supreme Court's decision in *Lambright*. *Id.* The Arizona Supreme Court reversed the court of appeals and affirmed the trial court's decision to use dual juries. *Id.* at 1011.

On direct appeal of his conviction and sentence, McKinney claimed that the dual juries caused the courtroom layout "with Defendants facing the jurors, [to be] intimidating and resulted in fundamental error requiring reversal." *McKinney*, 917 P.2d at 1232. The Arizona Supreme Court rejected this argument, concluding that McKinney could not demonstrate prejudice and provided no authority for "a constitutional right to a standard American courtroom arrangement." *Id.*

McKinney raised the "courtroom layout" issue again in his PCR Petition. The State PCR Court rejected McKinney's argument that the courtroom layout "tainted" the proceedings. McKinney also argued in the PCR Petition that the use of the dual juries violated his "right to a fundamentally fair trial" for a number of other reasons. However, McKinney did not

invoke the U.S. Constitution, nor did he cite to any state or federal cases.

McKinney raised the same "courtroom layout" claim in his federal habeas petition. McKinney also made a number of other arguments that the use of the dual juries prejudiced his right to a fair trial. The federal district court addressed each sub-part of McKinney's dual juries claim. Of those, the district court concluded that only McKinney's "courtroom layout" claim was even "arguably exhausted in state court." Despite this conclusion, however, the district court rejected all of McKinney's arguments on the merits.

## B.  "Courtroom layout" claim

McKinney exhausted his "courtroom layout" claim. "To exhaust his Arizona remedies, [a petitioner must] give the Arizona courts a fair opportunity to act on his federal due process claim before presenting it to the federal courts." *Castillo v. McFadden*, 399 F.3d 993, 998 (9th Cir. 2005) (internal quotation marks omitted). In so doing, a petitioner must apprise the state court that he is "making a claim under the U.S. Constitution, and describe both the operative facts and the federal legal theory on which [the] claim is based . . . ." *Id.* at 999 (internal quotation marks and citation omitted). This can be accomplished by citing "specific provisions of the federal constitution or . . . federal or state cases involving the legal standard for a federal constitutional violation." *Id.* "Mere 'general appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial,' do not establish exhaustion." *Id.* (quoting *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) (per curiam)); *see also Fields v. Waddington*, 401 F.3d 1018, 1021 (9th Cir. 2005) (holding

that a petitioner failed to exhaust a federal due process claim where petitioner's briefing to the state court mentioned the federal constitution only twice and due process only once). In short, a petitioner must "alert the state courts to the fact that he [is] asserting a claim under the United States Constitution." *Hiivala*, 195 F.3d at 1106.

McKinney set forth the "federal legal theory" underlying his prejudicial courtroom layout claim in his opening brief to the Arizona Supreme Court. McKinney claimed: "The bizarre and prejudicial seating arrangement deprived the appellant of due process under the Arizona and Federal Constitutions." The brief's table of contents also cites the page containing that sentence under its entry for the "Fifth Amendment." Taken together, the argument and the table of contents allude to a specific provision of the U.S. Constitution. McKinney's brief also invokes the U.S. Constitution numerous times in reference to other claims. Accordingly, McKinney's brief was sufficient to alert the Arizona Supreme Court that McKinney raised a federal claim. *See Robinson v. Schriro*, 595 F.3d 1086, 1103 (9th Cir. 2010) ("This is not a case where the petitioner failed to make clear that he was invoking a federal right, or where the petitioner's general appeal to a constitutional guarantee was too vague to put the state court on notice of the federal claim." (internal citations and quotation marks omitted)); *Hiivala*, 195 F.3d at 1106. Thus, we conclude that McKinney exhausted his "courtroom layout" claim.

Turning to the merits of McKinney's "courtroom layout" claim, we must determine whether the Arizona Supreme Court's decision rejecting this claim was contrary to, or an unreasonable application of, clearly established federal law. We conclude that it was not. McKinney cites no Supreme

Court case, and our search reveals no case, that would provide the basis for relief under § 2254(d)(1). Accordingly, we echo the Arizona Supreme Court's *McKinney* opinion, which held: "McKinney has not demonstrated any prejudice and provides no authority for his argument that there is a constitutional right to a standard American courtroom arrangement, and we decline to invent such a right." 917 P.2d at 1232. McKinney is not entitled to relief on his prejudicial courtroom layout claim.

## C. McKinney's "other" dual juries claims

In addition to the "courtroom layout" claim, McKinney makes several arguments in federal court that the use of the dual juries denied him his right to a fair trial. McKinney claims the dual juries prejudiced him, because: (1) Defendants presented antagonistic defenses, which led to prejudicial leading questions, limited cross-examination, and *Bruton* violations; and (2) the procedure necessitated increased security and the use of a leg brace during trial. The State argues that McKinney procedurally defaulted these claims by failing to fairly present them to the state court. We agree.

### 1. McKinney failed to exhaust his "other" courtroom layout claims.

McKinney's Arizona Supreme Court briefing did not set forth the operative facts or federal legal theory for any dual juries claim apart from the "courtroom layout" claim. The same is true of the PCR Petition. While the PCR Petition makes a general appeal to McKinney's right to "due process" and a "fair trial," this is insufficient to exhaust. *See Castillo*, 399 F.3d at 998; *Hiivala*, 195 F.3d at 1106. Accordingly,

McKinney failed to exhaust any potential claim arising out of the trial court's use of dual juries, except the "courtroom layout" claim.

McKinney argues that his claims were exhausted, because Hedlund raised the claims to the Arizona Supreme Court. However, "[t]he questions raised by [McKinney] involve constitutional privileges which are personal to him, and therefore an appeal by his co-defendant can not exhaust [his] remedies in the state courts." *Williams v. Nelson*, 431 F.2d 932, 932–33 (9th Cir. 1970) (per curiam).[5] Accordingly, McKinney failed to exhaust these claims because he failed to raise them personally to the state court.

## 2. McKinney's unexhausted dual juries claims are procedurally defaulted.

"A claim is procedurally defaulted 'if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Beaty*, 303 F.3d at 987 (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). McKinney's dual jury claims are procedurally defaulted, because he is barred "under Arizona law from going back to state court." *Id.*; *see also* Ariz. R. Crim. P. 32.2(a), 32.4(a).[6]

---

[5] Contrary to McKinney's argument, the subsequent case, *Harris v. Superior Court of the St. of Cal., Los Angeles Cnty.*, 500 F.2d 1124, 1126 (9th Cir. 1974) (en banc), did not affect this portion of *Williams*.

[6] Arizona Rules of Criminal Procedure 32.2(a) and 32.4(a) provide alternate bases for our conclusion that McKinney's claims would now be barred. Rule 32.2(a)(3) precludes "any claim that could have been brought on direct appeal or in a prior PCR petition." *Henry v. Ryan*, ___

"Nonetheless, we will review the merits if [McKinney] can show cause and prejudice or, alternatively, a fundamental miscarriage of justice." *Beaty*, 303 F.3d at 987. While McKinney mentioned these exceptions in his briefing, he made no argument that they apply to excuse the procedural default of his dual juries claims. At oral argument, when asked whether he could show cause, McKinney argued that he could establish cause under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). McKinney's invocation of *Martinez* suggests that McKinney argues that the ineffective assistance of his PCR counsel constitutes cause to overcome the procedural default of his other dual juries claims. However, it is well-settled that ineffective assistance of PCR counsel does not establish cause. *See Coleman*, 501 U.S. at 753–57. While *Martinez* created a "narrow exception" to this rule, 132 S. Ct. at 1315, the *Martinez* exception does not apply to McKinney's dual juries claims. The Supreme Court made clear that the exception applies only when the underlying constitutional claim is ineffective assistance of trial counsel. *Id.* Thus, McKinney cannot show cause and his dual juries claims are procedurally defaulted.

## II. "Shackling" Claim

McKinney failed to exhaust his "shackling" claim. Because McKinney would now be barred from bringing the claim in state court, *Beaty*, 303 F.3d at 987, the claim is procedurally defaulted. McKinney has failed to show cause and prejudice to overcome the default.

---

F.3d ___, 2013 WL 3027404, at *13 (June 19, 2013). Rule 32.4 bars untimely claims. *See, e.g.*, *Beaty*, 303 F.3d at 987.

## A.  Background and procedural history

The trial court required both McKinney and Hedlund to wear a leg brace during trial.  The trial court rejected Defendants' numerous objections to the use of the leg braces. The trial court reasoned that the Defendants' close proximity to jurors and court staff, the violent nature of the crimes, and evidence of McKinney's previous escape attempt and a subsequent escape plot warranted the extra security measures. The trial court later asked the State to make a specific record of the security concerns.  Although McKinney's motion for a new trial is silent on this issue, Hedlund raised the "shackling" issue at the post-trial phase.  Similarly, McKinney did not raise the "shackling" issue to the Arizona Supreme Court on direct appeal.  However, Hedlund did raise the claim, which was rejected.  *See McKinney*, 917 P.2d at 1222–23.  McKinney also failed to raise the issue in his PCR Petition.

The district court noted that McKinney did not raise the "shackling" issue on direct appeal or in his PCR Petition. The district court rejected McKinney's argument that the Arizona Supreme Court decided the issue as part of its "fundamental error review."  However, rather than decide that the claim was procedurally defaulted, the district court denied the claim as meritless.

## B.  McKinney's "shackling" claim is procedurally defaulted.

McKinney's "shackling" claim is not exhausted, because he failed to raise it to the Arizona Supreme Court or in his PCR Petition.  As with the dual jury claims, we reject McKinney's argument that the claim was exhausted by virtue

of Hedlund raising it on direct appeal. *See Williams*, 431 F.2d at 932–33. We also reject McKinney's argument that this claim was exhausted due to the Arizona Supreme Court's fundamental error review. "Where the parties did not mention an issue in their briefs and where the court did not mention it was considering that issue *sua sponte*, there is no evidence that the appellate court actually considered the issue, regardless of its duty to review for fundamental error, and the issue cannot be deemed exhausted." *Moormann v. Schriro*, 426 F.3d 1044, 1057 (9th Cir. 2005); *see also Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1306 (9th Cir. 1996) ("Under Arizona law, fundamental error review does not prevent subsequent procedural preclusion.").

This unexhausted claim is now procedurally barred, because McKinney would be barred from raising it to the state court. *Beaty*, 303 F.3d at 987; *see also* Ariz. R. Crim. P. 32.2(a), 32.4. Further, McKinney makes no argument for "cause" to excuse the default. Although McKinney makes numerous arguments of prejudice and injustice, he does not support these arguments with citations to any evidence in the record.[7] Thus, McKinney's "shackling" claim is procedurally barred.

---

[7] The only evidence offered to the state court on prejudice were statements from members of Hedlund's jury. Even if this evidence were probative of the McKinney jury's prejudice, it actually cuts against a prejudice finding. While jurors clearly saw the leg brace, the only jurors interviewed stated that the leg brace had no bearing on their verdict. While not "dispositive" of the prejudice issue, *see Holbrook v. Flynn*, 475 U.S. 560, 570 (1986), the jurors' statements arguably have some weight. Unlike the juror statements that were given "little stock" in *Holbrook*, the jurors gave their impressions of the leg brace in this case after the trial was over, not during voir dire. *See id.*

### III. *Lockett*/*Eddings* Claim.[8]

McKinney claims that the trial court did not adequately consider mitigating factors in imposing the death penalty, thereby violating McKinney's rights under *Lockett*, *Eddings*, and their progeny. McKinney argues that the trial court failed to consider mitigation evidence,[9] finding that McKinney's abusive childhood and its psychological effects did not affect McKinney's "ability to perceive, comprehend or control his actions." The State counters that the Arizona state courts fully considered all mitigating evidence and did not apply an unconstitutional nexus test. The State argues that the *Lockett*/*Eddings* line of cases holds only that a sentencer must fully *consider* proffered mitigation evidence and does not affect a sentencer's determination of its *weight*. We agree. Because the record makes clear that the trial court adequately considered and weighed McKinney's mitigation evidence, we deny relief.

---

[8] The district court declined to grant a COA on this issue. However, because McKinney exhausted this claim and because we conclude that the district court's resolution of the issue is "debatable amongst jurists of reason," *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003), we address it.

[9] In addition to evidence of childhood abuse and psychology, McKinney argues that the trial court failed to consider McKinney's level of participation in the murders. He develops this argument, without citation, in a single sentence: "The trial judge noted there is no proof McKinney killed Ms. Mertens at the Hedlund sentencing but not at Mr. McKinney's sentencing." Even assuming this properly characterizes the record, the record elsewhere reveals that the judge specifically considered McKinney's level of participation in the crimes at sentencing. The trial court specifically found "substantial participation in the McClain homicide by Mr. McKinney."

## A.  Background and procedural history

McKinney had a traumatic childhood.  At sentencing, the trial court heard evidence from McKinney's aunt and half-sister of various abuses against McKinney by his father and step-mother.  McKinney's would-be care givers neglected him by forcing him to live in appalling conditions. McKinney did not have adequate clothing or food. McKinney was also frequently beaten and locked out of the house in extreme weather.

The trial court also heard evidence that these abuses led McKinney to develop Post-Traumatic Stress Disorder ("PTSD").    After administering a number of tests, McKinney's expert, Dr. McMahon, testified that McKinney could be "emotionally overwhelmed by environmental stress and act in poorly-judged ways."  Dr. McMahon concluded that McKinney had "learning disabilities" but tested negative for "significant neuropsychological dysfunction."    Dr. McMahon testified that McKinney began abusing drugs and alcohol to distract him from his environmental stressors. Finally, Dr. McMahon opined that a sudden confrontation by Mertens during the course of the burglary could trigger a violent response from McKinney and that McKinney would have a "high likelihood" of diminished capacity in such an instance.

The trial court credited the testimony establishing McKinney's "traumatic childhood."  The trial court also accepted, for the purpose of sentencing, Dr. McMahon's PTSD diagnosis.  Nevertheless, the trial concluded:

> [A]fter considering all of the mitigating circumstances, the mitigating evidence that

was presented by the defense in this case as against the aggravating circumstances, and other matters which clearly are not set forth in the statute which should be considered by a court, I have determined that given . . . the aggravating circumstances which have been proven beyond a reasonable doubt by the State with respect to each of these homicides in Counts I and III have concluded that the mitigating circumstances simply are not sufficiently substantial to call for a leniency under all the facts of this case.

The Arizona Supreme Court rejected McKinney's argument that the trial court did not adequately take into account McKinney's abusive childhood and its effects. *McKinney*, 917 P.2d at 1234. The court reasoned that "the judge gave full consideration to McKinney's childhood and the expert testimony regarding the effects of that childhood . . . ." *Id.* The court explained that evidence of a traumatic childhood "does not necessarily have substantial mitigating *weight* absent a showing that it significantly affected or impacted the defendant's ability to perceive, comprehend, or control his actions." *Id.* (emphasis added).

The federal district court concluded that the Arizona Supreme Court's decision to uphold the sentence was not contrary to, nor an unreasonable application of, *Lockett/Eddings*.

**B. McKinney has failed to show that the Arizona Supreme Court unreasonably applied *Lockett/Eddings.***

In *Lockett*, the Supreme Court held:

> [T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. . . .
>
> Given that the imposition of death by public authority is . . . profoundly different from all other penalties, . . . [the sentencer must be free to give] independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation . . . .

438 U.S. at 604–05 (finding Ohio death penalty statute invalid where it permitted consideration of only three mitigating circumstances).

Later, in *Eddings*, the Supreme Court applied *Lockett* in a case where the trial judge found he could not consider in mitigation evidence of the defendant's family history.[10]

---

[10] In *Eddings*, the sentencing judge made clear, on the record, that he could not consider certain evidence as a matter of law. He stated: "[T]he Court cannot be persuaded entirely by the . . . fact that the youth was

455 U.S. at 112–13.  The appeals court affirmed the trial court, finding that the mitigation evidence was "not relevant because it did not tend to provide a legal excuse" for responsibility for the crime.  *Id.* at 113.  The Supreme Court reversed, explaining that "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as *a matter of law*, any relevant mitigating evidence. . . .The sentencer . . . may determine the weight to be given relevant mitigating evidence.  But they may not give it no weight by excluding such evidence from their consideration." *Id.* at 113–15.

In *Tennard v. Dretke*, the Supreme Court rejected a "nexus test" that would find mitigating evidence relevant only where it bears a causal nexus to the crime.  542 U.S. 274, 287 (2004) ("[W]e cannot countenance the suggestion that low IQ evidence is not relevant mitigating evidence . . . unless the defendant also establishes a nexus to the crime.").  Citing *Lockett* and *Eddings*, the Court cautioned that the jury must be given an effective vehicle with which to weigh mitigating evidence so long as the defendant has met a "low threshold for relevance," which is satisfied by "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Id.* at 284–85.

In *Smith v. Texas*, the Court again considered the use of a nexus test to determine whether mitigating evidence is relevant.  543 U.S. 37, 45 (2004).  The Court "unequivocally

---

sixteen years old when this heinous crime was committed.  *Nor can the Court in following the law, in my opinion, consider the fact of this young man's violent background.*"  455 U.S. at 109 (alterations in original).

rejected" any test requiring a causal nexus between mitigating evidence and the crime. *Id.*

We have held that *Tennard* and *Smith* are retroactively applicable to decisions such as the Arizona Supreme Court's 1996 decision in this case. *See Schad v. Ryan*, 671 F.3d 708, 723 (9th Cir. 2009) (per curiam), *cert. denied*, 133 S. Ct. 432 (2012). Thus, under clearly established federal law, we review (1) whether the trial court *considered* all relevant mitigating evidence, as required by *Lockett* and *Eddings*; and, (2) whether the Arizona Supreme Court applied an unconstitutional causal nexus test to exclude evidence proffered in mitigation, contrary to *Tennard* and *Smith*.

In this case, the Arizona courts did not improperly exclude any of McKinney's mitigating evidence. Further, the Arizona courts did not employ an unconstitutional nexus test. Thus, the Arizona Supreme Court's decision to affirm McKinney's sentence was not contrary to, nor an unreasonable application of, clearly established federal law.

### 1. All mitigating evidence was considered as required by *Eddings*.

The Arizona Supreme Court did not violate *Eddings* when it concluded that the trial court considered all the mitigation evidence before it. The Arizona Supreme Court clearly understood and applied the controlling Supreme Court precedent. *See McKinney*, 917 P.2d at 1227. It concluded: "[T]he judge *considered* McKinney's abusive childhood and its impact on his behavior and ability to conform his conduct and found it *insufficiently mitigating* to call for leniency." *Id.* at 1234 (emphasis added)). The Arizona Supreme Court did

not say that the evidence was irrelevant or could not be considered.[11] *Id.*

We reject McKinney's and the dissent's implication that the Arizona Supreme Court's decision merely paid lip service to *Eddings*, and the trial judge did not *actually* consider the evidence. As an initial matter, the trial court's certification that it considered all the mitigation evidence is entitled to some weight. *See Lopez*, 491 F.3d at 1037 ("'We must assume that the trial judge considered all this evidence before passing sentence. For one thing, he said he did.'" (quoting *Parker v. Dugger*, 498 U.S. 308, 314 (1991))). In addition, the record shows that the trial court's commitment to *Eddings* was more than semantic—the trial judge genuinely weighed the mitigation evidence's persuasive value. The trial judge expressly credited the evidence of childhood abuse, describing it as "beyond the comprehension and understanding of most people who have not grown up under those circumstances." The trial court also accepted, for the purpose of sentencing, Dr. McMahon's PTSD diagnosis. Further, even when the court discussed the possible link between McKinney's PTSD and the crimes, the record shows that it considered all the evidence and weighed the evidence's probative value. The trial judge stated:

> I found it interesting Dr. McMahon also indicated that one of the techniques—or the

---

[11] Other cases pre-dating or contemporaneous with *McKinney* also demonstrate that the Arizona Supreme Court was well-aware of the *Lockett*/*Eddings* line of cases and the requirement that the sentencing court fully consider all mitigating evidence. *See, e.g.*, *State v. Towery*, 920 P.2d 290, 310–11 (Ariz. 1996) (en banc); *State v. Gonzales*, 892 P.2d 838, 851 (Ariz. 1995) (en banc).

> manifestations of Post-traumatic Stress
> Syndrome that might be expected were that
> the individual be depressed, would be
> withdrawn. It appears to me that defense
> attempted to demonstrate that in their
> presentation of mitigating circumstances and
> that such an individual would expect to avoid
> contacts which would either exacerbate or
> recreate the trauma that would bring on this
> type of stress from childhood. And yet, rather
> than continue to avoid any of these
> circumstances after the Mertens homicide, it
> appears that the same thoughtful, reflective
> planning went into, then, the burglary of a
> known target to both the defendant and the co-
> defendant, Mr. McClain.

Other portions of the sentencing transcript similarly
demonstrate the judge's deliberative process as he considered
the PTSD evidence and weighed it against the other evidence
presented. This careful analysis of Dr. McMahon's testimony
contradicts McKinney's and the dissent's claim that the
sentencing judge excluded the evidence, or refused to
consider it, as a matter of law.[12]

---

[12] This obvious deliberation is in sharp contrast to the sentencing court
record in *Towery.* In that case, we upheld the Arizona Supreme Court's
decision to deny relief under *Eddings* despite some language in the
sentencing transcript indicating that mitigating evidence was excluded, or
not considered. *See* 673 F.3d at 936–37, 946–47. For example, the
sentencing judge stated: "[A] difficult family background in and of itself,
is not a mitigating circumstance." *Id.* at 936. The sentencing court went
on to explain that "[a] difficult family background is a *relevant* mitigating
circumstance, if a defendant can show that something in that background
had an [e]ffect or impact on his behavior that was beyond the defendant's

The dissent selectively quotes passages from the sentencing transcript to argue that the Arizona state courts did not properly consider evidence of PTSD. There are two problems with the dissent's approach. First, it reads too much into certain passages, notably the sentencing judge's discussion of the psychological study submitted as Exhibit 3. Contrary to the dissent's view, nothing in the sentencing judge's discussion of PTSD shows that he believed it was "irrelevant" as a matter of law. At most, the discussion of PTSD shows that the sentencing judge was equivocal about what effect in mitigation the PTSD diagnosis should have. This strengthens the conclusion that the sentencing judge considered the evidence and did not simply exclude it. However, even if the sentencing judge created some ambiguity in the record by "thinking out loud" as he considered the PTSD evidence, that ambiguity should be cast in favor of the state. *See Poyson v. Ryan*, 711 F.3d 1087, 1099 (9th Cir. 2013).

Similarly, the dissent overlooks passages where the sentencing judge clearly stated that he considered "all of the mitigating circumstances." Contrary to the dissent's view, we do not fail to take into account the difference between the sentencing judge's treatment of the PTSD and other mitigation evidence. There is no difference in treatment. The record clearly shows the sentencing judge's deliberation as he considered each piece of mitigation evidence. Thus, the record as a whole contradicts the dissent's view that the

---

control." *Id.* (emphasis added) (second alteration in original). Here, the record makes clear that both the sentencing court and the Arizona Supreme Court fully considered all mitigating evidence. Thus, the proper resolution of the *Eddings* issue in this case is even clearer than it was in *Towery.*

Arizona state courts rejected the PTSD evidence as a matter of law.

Because the record shows that the sentencing judge considered all the potential mitigation evidence, we reject McKinney's and the dissent's reliance on a number of our past cases granting relief. *See, e.g.*, *Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010); *Styers v. Schriro*, 547 F.3d 1026, 1035–36 (9th Cir. 2008); *Lambright v. Schriro*, 490 F.3d 1103, 1115 (9th Cir. 2007). Those cases provide little guidance to inform our AEDPA review. For example, in *Williams*, we granted relief under *Lockett*/*Eddings*. However, unlike the state courts here, the state courts in *Williams* held that the mitigating evidence "could not be considered as a mitigating factor of any kind." 623 F.3d. at 1270 (internal quotation marks omitted). This statement resembles the clear statement from *Eddings* that the trial judge excluded mitigation evidence as a matter of law. *See Eddings*, 455 U.S. at 109. *Styers* and *Lambright*, also cited by McKinney and the dissent, contain similar statements. *See Styers*, 547 F.3d at 1035–36 (granting relief under *Eddings* where Arizona Supreme Court analysis made clear that mitigating evidence was not considered); *Lambright*, 490 F.3d at 1115 (granting relief under *Lockett* where the trial court did not consider "any evidence without an explicit nexus to the crime, or . . . gave such evidence de minim[i]s weight").

The record in this case does not contain the same clear statement of exclusion that appears in those cases, rendering them inapposite. *See Schad*, 671 F.3d at 724 (distinguishing *Styers* and *Lambright*, because "[i]n both of those cases . . . it was clear from the record that the lower court had applied the unconstitutional nexus test and had *excluded* mitigation

evidence" (emphasis added)). We will not second-guess the Arizona state courts' application of *Eddings* where the record shows that the courts considered and weighed all mitigation evidence[13] and did not make a clear, affirmative statement of exclusion. *See id.* ("Absent a clear indication in the record that the state court applied the wrong standard, we cannot assume the courts violated *Eddings*'s constitutional mandates."); *see also Lopez*, 491 F.3d at 1036–38 (denying relief under *Eddings* where "the sentencing court did not prevent [the petitioner] from presenting any evidence in mitigation, nor did it affirmatively indicate that there was any evidence it would not consider").

---

[13] The dissent argues that the Arizona Supreme Court's conclusion that the sentencing judge "gave full consideration to" McKinney's PTSD evidence, *see McKinney*, 917 P.2d at 1234, was based on an unreasonable determination of fact under § 2254(d)(2). The dissent also argues that the sentencing judge never accepted Dr. McMahon's PTSD diagnosis, nor made a finding of PTSD, which tainted the Arizona Supreme Court's review.

As demonstrated above, the record contradicts both arguments. As the dissent acknowledges, "the sentencing judge did quite a bit of talking about PTSD . . . ." This discussion demonstrates the sentencing judge's deliberative process—his weighing of the evidence. There would have been little need to do so much "talking" about the PTSD diagnosis if he planned to exclude it as a matter of law. Further, the record demonstrates that the sentencing judge assumed that the PTSD diagnosis was true. Nothing required the sentencing judge to make a particular finding that the diagnosis was accurate, because the record shows that he was able to adequately weigh the evidence by assuming that it was true.

**2. The Arizona Supreme Court did not apply an unconstitutional nexus test to McKinney's mitigating evidence.**

As we have previously recognized, state courts are free to consider a nexus to determine the weight to give mitigation evidence. *See Schad*, 671 F.3d at 723 ("The United States Supreme Court has said that the use of the nexus test in this manner is not unconstitutional because state courts are free to assess the weight to be given to particular mitigating evidence."). For example, we upheld the Arizona Supreme Court's exercise of this discretion in *Towery v. Ryan*, 673 F.3d 933, 944–45 (9th Cir. 2012), *cert. denied*, 132 S. Ct. 1738 (2012). In *Towery*, we reviewed the Arizona Supreme Court's rulings that (1) the sentencing court "must consider the defendant's upbringing if proffered but is not required to give it significant mitigating weight" and (2) the question of "[h]ow much weight should be given proffered mitigating factors is a matter within the sound discretion of the sentencing judge." *Id.* at 938. We concluded that these were "correct statements of the law." *Id.* at 944. We also affirmed the ruling that "a difficult family background is not always entitled to great weight as a mitigating circumstance," and "where the defendant fails to connect his family background to his criminal conduct, a trial judge could give it little or no weight or value." *Id.* at 944–45.

Here, like in *Towery*, the Arizona Supreme Court concluded that "a difficult family background, including childhood abuse, does not necessarily have substantial mitigating weight absent a showing that it significantly affected or impacted the defendant's ability to perceive, comprehend, or control his actions." *McKinney*, 917 P.2d at 1234. While the Arizona Supreme Court ultimately decided

that the cumulative weight of the mitigating evidence did not call for leniency, the court based this conclusion on the *weight* assigned to mitigating factors. Nothing in the record suggests that the Arizona Supreme Court outrightly rejected, or otherwise did not fully consider, those factors due to a lack of nexus to the crime. Accordingly, the Arizona Supreme Court did not apply an unconstitutional nexus test when it affirmed the sentencing court's exercise of discretion over the weight to assign the evidence that it considered.

We reject the dissent's argument that other Arizona Supreme Court cases applying an unconstitutional nexus test demonstrate that the Arizona Supreme Court "followed suit" in this case. We have formerly rejected the argument that "the Arizona Supreme Court's historical use of an unconstitutional causal nexus test" creates a presumption of error. *See Poyson*, 711 F.3d at 1099. Any such presumption would be especially inappropriate here, because the Arizona Supreme Court's decision makes clear that it did not apply an unconstitutional nexus test.[14]

McKinney makes much of the Arizona Supreme Court's citation to *State v. Ross*, 886 P.2d 1354 (Ariz. 1994). In *Ross*, the Arizona Supreme Court stated "[a] difficult family background is not a *relevant* mitigating circumstance unless 'a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant's control.'" *Id.* at 1363 (emphasis added) (quoting

---

[14] We also reject the dissent's view that the sentencing court (as distinct from the Arizona Supreme Court) impermissibly applied a causal nexus test. As discussed above, the record makes clear that the sentencing court did not exclude any evidence due to a lack of causal nexus to the crime, or for any other reason.

*State v. Wallace*, 773 P.2d 983, 986 (Ariz. 1989)). McKinney argues that the Arizona Supreme Court's citation to *Ross* demonstrates that it held the mitigation evidence irrelevant and unconstitutionally excluded it for its lack of causal nexus to the crime.

We reject this argument, just as we rejected a similar argument in *Towery*, where the Arizona Supreme Court supported its decision with a citation to *Wallace*. *See Towery*, 673 F.3d at 946. While the *Towery* court deemed *Wallace* (and, by extension, *Ross*) "constitutionally suspect," this does not end the analysis. *See id*. We must review the record in McKinney's case to determine whether the sentencing court and the Arizona Supreme Court actually applied the unconstitutional test. *See id*. For the reasons stated above, we conclude that the Arizona Supreme Court did not apply an unconstitutional nexus test, notwithstanding the citation to *Ross*.[15] Thus, McKinney has failed to establish that the Arizona Supreme Court's decision to uphold the trial court was contrary to, or an unreasonable application of, *Lockett/Eddings*.

## CONCLUSION

The district court properly denied relief on McKinney's "courtroom layout" and *Lockett*/*Eddings* claims, because the Arizona Supreme Court's decision denying relief was not contrary to, nor an unreasonable application of, clearly established federal law or based on an unreasonable

---

[15] At least one Arizona Supreme Court case decided after *McKinney* recognizes that *McKinney* discussed "weighing" the mitigating evidence, notwithstanding *McKinney*'s citation to *Ross*. *See State v. Greene*, 967 P.2d 106, 118 (Ariz. 1998) (en banc).

determination of the facts. The district court also properly denied relief on McKinney's remaining dual juries and "shackling"claims, because the claims are procedurally defaulted.

**AFFIRMED.**[16]

WARDLAW, Circuit Judge, concurring in part and dissenting in part:

Because McKinney failed to exhaust the dual juries and shackling claims, I agree with the majority's conclusion that denial of relief on these claims must be upheld. However, I disagree with its analysis of McKinney's *Eddings* claim[1] and, therefore, dissent from Part III of the majority's opinion. It is clear from the record that the sentencing judge improperly refused to consider the mitigating effect of McKinney's post traumatic stress disorder ("PTSD") evidence specifically because the judge concluded that this evidence was not causally linked to McKinney's crimes, contrary to the U.S. Supreme Court's decisions in *Eddings* and its progeny. The Arizona Supreme Court repeated that legal error, resulting in

---

[16] On December 3, 2012, McKinney filed a "Motion to File Late Supplemental Authorities." While we see no reason that these authorities could not have been presented in a 28(j) letter, we nevertheless "grant" the motion. However, none of the authorities referenced provide any basis for relief under AEDPA.

[1] The panel majority agrees that we should address McKinney's uncertified *Lockett/Eddings* claim because the resolution of this issue is "debatable amongst jurists of reason." *Miller-El v. Cockrell*, 537 U.S. 322, 330 (2003).

a decision that "was contrary to . . . clearly established
Federal law, as determined by the Supreme Court of the
United States." 28 U.S.C. § 2254(d)(1). Further, the Arizona
Supreme Court's characterization of the sentencing judge's
decision was factually inaccurate, resulting "in a decision that
was based on an unreasonable determination of the facts in
light of the evidence presented in the State court proceeding."
28 U.S.C. § 2254(d)(2). McKinney has demonstrated that he
is entitled to habeas relief regardless of whether *Eddings*
violations are deemed structural error or are reviewed for
harmless error. I would therefore reverse the district court's
denial of all relief and remand with instructions to grant
McKinney's habeas petition based on this claim.

## I.

It was well established in 1993, when McKinney was
sentenced, that "[j]ust as the State may not by statute preclude
the sentencer from considering any mitigating factor, neither
may the sentencer refuse to consider, *as a matter of law*, any
relevant mitigating evidence." *Eddings v. Oklahoma*,
455 U.S. 104, 113–14 (1982). The Supreme Court has
clarified that the Eighth and Fourteenth Amendments
specifically require the sentencer to fully consider all
mitigating evidence, regardless of the lack of a causal
connection between the evidence and the defendant's crime
of conviction:

> There is no disputing that this Court's
> decision in *Eddings* requires that in capital
> cases the sentencer . . . not be precluded from
> considering, *as a mitigating factor,* any aspect
> of a defendant's character or record and any
> of the circumstances of the offense that the

defendant proffers as a basis for a sentence less than death. Equally clear is the corollary rule that the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence. These rules are now well established . . . .

*Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (internal quotation marks and citations omitted) (emphasis added); *see also Eddings*, 455 U.S. at 110. In *Smith v. Texas*, 543 U.S. 37 (2004), the Court explained that such causal "nexus requirements" are "a test we never countenanced and now have unequivocally rejected." *Id.* at 45 (citing *Eddings*, 455 U.S. at 114); *see also Smith*, 543 U.S. at 45 (holding that it was "plain under [Supreme Court] precedents" that evidence lacking a "nexus" to the crime of conviction "was relevant for mitigation purposes"). Accordingly, the Constitution forbids sentencers in capital cases from refusing to consider any mitigating evidence on the basis that the evidence lacks a nexus to a defendant's crime of conviction.

It was also well established when McKinney was sentenced that *Eddings* and its progeny require that the sentencer give "independent mitigating weight" to all relevant mitigating evidence. *See Eddings*, 455 U.S. at 110. This has been a cornerstone of the Supreme Court's jurisprudence since *Lockett* was decided in 1978:

> [A] statute that prevents the sentencer in all capital cases from giving *independent mitigating weight* to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in

spite of factors which may call for a less
severe penalty. When the choice is between
life and death, that risk is unacceptable and
incompatible with the commands of the
Eighth and Fourteenth Amendments.

*Lockett v. Ohio*, 438 U.S. 586, 605 (1978) (emphasis added).
The Court has recognized that the sentencer must perform an
individualized analysis of each piece of relevant mitigating
evidence: "the sentencer must be free to give 'independent
mitigating weight to aspects of the defendant's character and
record and to circumstances of the offense proffered in
mitigation . . . .'" *Eddings*, 455 U.S. at 110 (quoting *Lockett*,
438 U.S. at 605). Supreme Court precedent thus requires the
sentencer to give adequate and independent consideration to
all relevant evidence that a defendant proffers in mitigation
of his crimes.

Finally, the rule announced in *Eddings* requires that the
sentencer *actually consider* each independent piece of
relevant mitigating evidence. *See Eddings*, 455 U.S. at 113.
*Lockett* and *Eddings* both emphasize the significance of "the
type of individualized consideration of mitigating factors"
required by the Eighth and Fourteenth Amendments. *See
Eddings*, 455 U.S. at 105; *Lockett*, 438 U.S. at 606.
Certainly, the appropriate degree of care or caution that must
be accorded to each independent piece of mitigating evidence
will vary. *See* Webster's Third New International Dictionary
483 (1986) (defining "consider" as "to reflect on: think about
with a degree of care or caution"). However, it is clear that
whether a sentencer "said he did" enough to comply with the
Constitution is irrelevant for constitutional purposes; the true
test is whether the sentencer *actually* exercised "the type of

individualized consideration" required by the Constitution. *Eddings*, 455 U.S. at 105.

## II.

McKinney argued at sentencing that he should not be sentenced to death due to his difficult childhood, alcohol addiction, good behavior while incarcerated, and residual doubt concerning his role in the offenses. In addition, McKinney specifically raised his PTSD diagnosis as a mitigating factor independent of the underlying childhood trauma he suffered and as a factor to be given separate weight at sentencing.

As support for imposition of a noncapital sentence, McKinney presented evidence at sentencing as to what even the sentencing judge found to be an "extraordinary" and "traumatic childhood," which would be "beyond the comprehension and understanding of most people . . . ." Sentencing Hr'g Tr. at 26, July 23, 1993. McKinney's sister, Diana McKinney, and aunt, Susan Sestate, both testified at length concerning McKinney's horrific childhood. They testified that McKinney grew up in extreme poverty, living in filth, lacking adequate clothing, and suffering constant physical and emotional abuse, largely at the hands of his stepmother. He and his three siblings shared a single bedroom and were expected to do all of the cleaning and cooking in the home. McKinney consistently arrived at school poorly dressed, dirty, and covered in welts and bruises from beatings he received at home. Unsurprisingly, McKinney ran away repeatedly, appearing at the homes of relatives and friends bearing signs that he had been beaten. The sentencing judge found this testimony credible, determining that as a child McKinney was "abused, beaten,

and deprived of the necessary care, clothing, and parental love and affection."

In addition to enduring a horrific childhood, as an adult McKinney suffered serious psychological problems. At sentencing, Dr. Mickey McMahon, a clinical psychologist, testified to his opinion that McKinney suffered from PTSD, writing in his expert report that McKinney "underwent a massive amount of neglect and abuse during his developmental years which in my opinion was sufficient to create a case of Post-Traumatic Stress Disorder." Dr. McMahon also described numerous ways in which this disorder could have affected McKinney and impaired his ability to control his behavior on the nights of the murders. Specifically, Dr. McMahon testified that McKinney's PTSD may have caused him to have a "reflexive" and "emotional" response to any confrontation during the burglary, which could have led to his having "diminished capacity" at the time of the murders. Dr. McMahon concluded by testifying that he had no doubt that McKinney suffered from PTSD. In addition to Dr. McMahon's testimony that McKinney suffered from PTSD, another doctor testified on McKinney's behalf concerning his below-average intelligence.

Despite this evidence, the sentencing judge refused to give McKinney's PTSD diagnosis any weight in mitigation because McKinney failed to show that the PTSD had any direct effect on his crimes. In fact, the sentencing judge declined even to make a finding as to whether McKinney actually suffered from PTSD because he concluded that this was irrelevant to his sentencing decision. The sentencing judge initially discussed McKinney's PTSD in two sentences, which, although nearly incoherent, express the view that the expert's PTSD diagnosis was, at a minimum, suspect:

However, in viewing Exhibit 3, which defense introduced and Dr. McMahon acknowledged either reviewing or relying upon, it appeared that in reviewing that exhibit that even those experts who agree that Post-traumatic Stress Syndrome can result from childhood abuse and be a lingering problem of individuals who have been abused, beaten and deprived of the necessary care, clothing, and parental love and affection that Mr. McKinney was – obviously, through the testimony, was deprived of in this case – nevertheless have concluded as Dr. McMahon indicated, there was a cognitive impairment of the defendant.  There was no evidence presented of any organic brain damage or disease of the defendant; that in Exhibit 3, it appears at least in the sample of individuals in that case and comparing those individuals with cognitive impairment, with abuse, where there was not psychotic episodes or neurological damage to a defendant, where at least two or three of those things were present, that if only cognitive impairment and abuse were present, if there was nothing significantly significant in the violent offenses expected to be committed by those individuals, the experts found that there was no significant difference between an individual with cognitive impairment who suffered with child abuse with no history of cognitive abuse or those who had only been abused or only had a cognitive deficit.

Sentencing Hr'g Tr. at 27–28, July 23, 1993.

Exhibit 3, to which the sentencing judge refers, is a paper prepared in 1989 by researchers at the New York University School of Medicine, Department of Psychiatry, which attempts to predict which violent delinquents will go on to commit adult aggressive offenses. Dorothy Otnow Lewis, M.D. et al., *Toward a Theory of the Genesis of Violence: A Follow-up Study of Delinquents*, 28 J. AM. ACAD. CHILD & ADOLESCENT PSYCHIATRY 431 (1989). The paper concludes that "a constellation of interacting clinical and environmental variables is a far better predictor of future violent behavior than is early aggression alone." *Id.* at 436. In this passage of the sentencing transcript, the sentencing judge is stating that because there was no evidence that McKinney suffered certain of the clinical variables identified in the paper, i.e. a psychotic episode or neurological damage, there was no correlation between his diagnosis of PTSD and the commission of his crimes. And because the sentencing judge so concluded, he unconstitutionally screened out PTSD as a matter of law, before it could be weighed along with the other mitigating and aggravating factors. Of course, doing so was nonsensical as well, because the study only purports to predict which abused adolescents will become violent adults who commit murder. At this point, McKinney had been convicted of two murders, so he had already committed what the paper describes as "the most serious of crimes." *Id.* at 435. The issue for the sentencing judge was not whether McKinney's crimes were predictable; it was whether the fact that McKinney suffered from PTSD reduced his culpability for the murders—an issue the judge declined to address because his reading of the study caused him to conclude that the PTSD diagnosis was not causally related to McKinney's crimes.

Having done so, the sentencing judge explicitly declined to make a finding as to whether McKinney actually suffered from PTSD, because he viewed this as irrelevant given the lack of a nexus between the PTSD and McKinney's crimes:

> But, I think more importantly than that, certainly not trying to dispute him as an expert on what all that meant, it appeared to me that Dr. McMahon did not at any time suggest in his testimony nor did I find any credible evidence to suggest that, *even if the diagnoses of Post-traumatic Stress Syndrome were accurate in Mr. McKinney's case, that in any way significantly impaired Mr. McKinney's conduct.*

Sentencing Hr'g Tr. at 28 (emphasis added). If this articulation of an impermissible nexus test were not clear enough, the sentencing judge next confirmed that he excluded the PTSD evidence from his mitigation analysis because there was no evidence linking the PTSD to McKinney's criminal conduct:

> [I]t appeared to me that based upon all these circumstances that there simply was no substantial reason to believe that even if the trauma that Mr. McKinney had suffered in childhood had contributed to an appropriate diagnosis of Post-traumatic Stress Syndrome that it in any way affected his conduct in this case.

*Id.* at 29. The sentencing judge reaffirmed for a third time that he excluded the PTSD diagnosis from his consideration

of whether to sentence McKinney to life or death because he
did not believe this evidence had a causal relationship with
McKinney's crimes under Arizona's death penalty statute:

> I've determined that even though there may
> be some evidence by Dr. McMahon that
> would demonstrate under [Ariz. Rev. Stat.
> Ann. § 13–751](G)(1) a capacity by the
> defendant to appreciate the wrongfulness of
> conduct, it was not significantly impaired,
> either by the use of drugs, alcohol or the
> possibility of a diagnosis of Post-traumatic
> Stress Syndrome.

*Id.* at 30.  There can be no doubt that the sentencing judge
disposed of McKinney's PTSD diagnosis by concluding that
its validity was irrelevant because the lack of a nexus between
the PTSD and McKinney's criminal conduct made it
nonmitigating as a matter of law.  As discussed more fully
below, McKinney presented this evidence for two reasons: to
suggest that he had diminished capacity on the night of the
murders and to demonstrate that he was less culpable for his
crimes than someone who did not suffer from PTSD.  The
sentencing judge addressed the first argument, finding that
McKinney's capacity was not diminished.  However, he
failed to address whether the PTSD diagnosis had any impact
on McKinney's culpability for his crimes.  This serious
*Eddings/Lockett* error violated the Eighth and Fourteenth
Amendments.

## III.

On direct appeal, the Arizona Supreme Court[2] agreed with the sentencing judge that the absence of a causal relationship between McKinney's PTSD diagnosis and his crimes rendered this evidence nonmitigating as a matter of law. Thus, the Arizona Supreme Court's decision was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In addition, the Arizona Supreme Court failed to accurately describe or analyze the sentencing judge's rationale in sentencing McKinney. As a result, the Arizona Supreme Court's decision also was "based on an unreasonable determination of the facts" under 28 U.S.C. § 2254(d)(2). These legal and factual errors satisfy § 2254(d), entitling McKinney to habeas relief under AEDPA.

First, the Arizona Supreme Court's opinion repeats the sentencing judge's unconstitutional treatment of McKinney's PTSD diagnosis:

> [T]he record shows that the judge gave full consideration to McKinney's childhood and the expert testimony regarding the effects of that childhood, specifically the diagnosis of post-traumatic stress disorder (PTSD).

---

[2] As Judge Thomas makes eminently clear in his dissent in *Poyson v. Ryan*, 711 F.3d 1087 (9th Cir. 2013), "At the time it decided this case, the Arizona Supreme Court applied a causal nexus test similar to the one the U.S. Supreme Court held unconstitutional in *Tennard* [*v. Dretke*, 542 U.S. 274 (2004)]." *Poyson*, 711 F.3d at 1105 (Thomas, J., dissenting) (listing Arizona cases).

> *Assuming the diagnoses were correct, the*
> *judge found that none of the experts testified*
> *to, and none of the evidence showed, that such*
> *conditions in any way significantly impaired*
> *McKinney's ability to conform his conduct to*
> *the law.*

*State v. McKinney*, 917 P.2d 1214, 1234 (Ariz. 1996)
(emphasis added). In doing so, the court agreed with the
sentencing judge that McKinney's PTSD evidence was
nonmitigating as a matter of law because McKinney failed to
show a relationship between the diagnosis and his crimes. As
discussed above, this was contrary to then-clearly established
constitutional law and therefore meets the requirements of
§ 2254(d)(1).[3]

Second, the Arizona Supreme Court's decision was based
on two independent "unreasonable determination[s] of the
facts in light of the evidence presented in the State court
proceeding." 28 U.S.C. § 2254(d)(2). Contrary to the court's

---

[3] In concluding that the "Arizona Supreme Court did not apply an
unconstitutional nexus test to McKinney's mitigating evidence," the
majority fails to distinguish between Arizona's unconstitutional treatment
of McKinney's PTSD diagnosis and its permissible treatment of other
mitigation evidence. However, we have never held that a state's
permissible treatment of some mitigation evidence can somehow "cure"
the unconstitutional treatment of other mitigating evidence. Nor could we
have, as *Eddings* and *Lockett* make clear that the Eighth and Fourteenth
Amendments require that all relevant evidence must be given
"*independent* mitigating weight." *Eddings*, 455 U.S. at 110 (emphasis
added). Therefore, it is irrelevant for constitutional purposes that the
sentencing judge adequately considered some of McKinney's mitigation
evidence; that he failed to adequately consider independently the PTSD
diagnosis is sufficient to establish that McKinney is entitled to habeas
relief.

bald statements, the sentencing judge never "gave full consideration to" McKinney's PTSD diagnosis as a possible mitigating factor favoring a life sentence over death. *McKinney*, 917 P.2d at 1234. In fact, while the sentencing judge did quite a bit of talking about PTSD, much of this discussion related to the predictive analysis in Exhibit 3 as his reason for screening out the PTSD diagnosis as a mitigating factor, and refusing to weigh it with other relevant factors. Certainly, nothing in the record indicates that the sentencing judge exercised "the type of individualized consideration of mitigating factors . . . required by the Eighth and Fourteenth Amendments." *Eddings*, 455 U.S. at 105 (quoting *Lockett*, 438 U.S. at 606). Instead, the sentencing judge only "considered" McKinney's PTSD evidence in the sense that he determined that there was no causal relationship between it and McKinney's crimes. As discussed above, this is insufficient under *Eddings* and *Lockett*. Thus, the Arizona Supreme Court's decision was based on the unreasonable factual determination that the sentencing judge fully considered McKinney's PTSD evidence as a mitigating factor. This factual error satisfies § 2254(d)(2).

The Arizona Supreme Court's second unreasonable factual determination concerns the sentencing judge's refusal to accept McKinney's PTSD diagnosis for sentencing purposes. While the sentencing judge expressly declined to determine whether McKinney suffered from PTSD on the basis that the question was irrelevant to his sentencing determination, the Arizona Supreme Court incorrectly stated that the sentencing judge "assum[ed] the diagnoses were correct" when sentencing McKinney. *McKinney*, 917 P.2d at 1234. However, as set forth above, the record contradicts this statement. In fact, the sentencing judge specifically declined to make a finding on this point on the grounds that "even if

the diagnoses of [PTSD] were accurate in Mr. McKinney's case, [I do not believe that it] in any way significantly impaired Mr. McKinney's conduct." Sentencing Hr'g Tr. at 28, July 23, 1993; *see also id.* at 30 ("[E]ven though there may be some evidence [demonstrating] a capacity by the defendant to appreciate the wrongfulness of conduct [sic], it was not significantly impaired [by] *the possibility of a diagnosis* of Post-traumatic Stress Syndrome."(emphasis added)). Thus, the sentencing judge never accepted the diagnosis as correct. Instead, he did not believe it was necessary to determine whether McKinney suffered from PTSD because the absence of a causal relationship between the PTSD and McKinney's crimes rendered this evidence nonmitigating as a matter of law. Given this, the Arizona Supreme Court's decision was based on two "unreasonable determination[s] of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2).

While unconstitutional, the Arizona courts' inconsistent treatment of McKinney's childhood and PTSD mitigation evidence is explicable as consistent with then-operative Arizona state law. Section 13-751 of the Arizona Revised Statutes sets forth the factors which permissibly may be considered as mitigating under state law. Ariz. Rev. Stat. § 13-751(G)(1). At the time, § 13-751(G)(1) permitted sentencers to give mitigating effect to mental impairments, such as PTSD, only when "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired but not so impaired as to constitute a defense to prosecution." Given the language of this statute, it is not surprising that both Arizona courts' decisions track that language when discussing McKinney's PTSD evidence. Just compare the sentencing judge's statement that "even if the

diagnoses of Post-traumatic Stress Syndrome were accurate in Mr. McKinney's case, [I do not believe] that in any way significantly impaired Mr. McKinney's conduct," and the Arizona Supreme Court's statement that "none of the evidence showed . . . that such conditions in any way significantly impaired McKinney's ability to conform his conduct to the law," *McKinney*, 917 P.2d at 1234, with the language of § 13-751(G)(1). Further, as discussed above, the sentencing judge went so far as to make his reliance on § 13-751(G)(1) explicit, stating that McKinney's PTSD evidence was irrelevant because "even though there may be some evidence . . . that would demonstrate under (G)(1) a capacity by the defendant to appreciate the wrongfulness of conduct, it was not significantly impaired [by] the possibility of a diagnosis of Post-traumatic Stress Syndrome." Sentencing Hr'g Tr. at 30, July 23, 1993.

It was not until 2006, over a decade after McKinney was sentenced, that the Arizona Supreme Court acknowledged that the United States Constitution required it to construe § 13-751(G)(1)'s nexus requirement as useful to only the determination of how much *weight* to give mitigating evidence—as opposed to excluding it from consideration. *See Schad v. Ryan*, 671 F.3d 708, 723 (9th Cir. 2011) (citing *State v. Newell*, 132 P.3d 833, 849 (Ariz. 2006)). However, prior to 2006, Arizona state courts routinely imposed an unconstitutional nexus requirement on mental impairments. *See, e.g.*, *Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) (finding a constitutional violation where Arizona courts refused to consider drug use as mitigating due to lack of a nexus); *Styers v. Schriro*, 547 F.3d 1026, 1035 (9th Cir. 2008) (per curiam) (finding a constitutional violation where Arizona courts refused to consider PTSD evidence as mitigating due to lack of a nexus). We can infer from the Arizona state

courts' pre-2006 treatment of mental impairment mitigation evidence in capital sentencings that the Arizona state courts here simply followed suit. However, regardless of the explanation for the Arizona Supreme Court's various factual and legal errors, these constitutional violations establish that McKinney is entitled to habeas relief under AEDPA. *See* 28 U.S.C. § 2254(d).

## IV.

There is no question that McKinney's PTSD evidence is "relevant mitigating evidence" for constitutional purposes. *Eddings*, 455 U.S. at 114; *see also Tennard v. Dretke*, 542 U.S. 274, 284 (2004) ("[T]he meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding than in any other context, and thus the general evidentiary standard—any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence—applies." (internal quotation marks omitted)). The Supreme Court has confirmed that disorders like PTSD are relevant for mitigation purposes:

> [E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.

*Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal citations and quotation marks omitted) *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).

We have also specifically held that PTSD evidence is relevant mitigation evidence. *See Styers*, 547 F.3d at 1035. In *Styers*, we granted a habeas petition when the Arizona courts refused to consider PTSD mitigation evidence under circumstances virtually identical to those presented here. Styers, convicted of murder, had produced evidence at sentencing that he suffered from PTSD. *Id.* The *Styers* sentencing judge refused to consider the evidence on the basis that "two doctors who examined defendant could not connect defendant's condition to his behavior at the time of the conspiracy and the murder." *Id.* (citing *State v. Styers*, 865 P.2d 765 (Ariz. 1993)). As in the present appeal, the Arizona Supreme Court in *Styers* ignored this language, instead asserting, like here, that the sentencing judge had "considered all of the proffered mitigation." *Id.* (citing *Styers*, 865 P.2d at 778). However, unlike the majority here, in *Styers*, we refused to accept this conclusory statement as dispositive. *Id.* Instead, we recognized that the Arizona courts had failed to weigh Styers's PTSD as evidence in mitigation on the basis that the experts did not connect the PTSD to his behavior at the time of the murder. *Id.* We held that the Arizona court had applied an unconstitutional "nexus test to conclude that Styers's post traumatic stress disorder did not qualify as mitigating evidence," and granted Styers's petition on the ground that this was "directly contrary to the constitutional requirement that all relevant mitigating evidence be considered by the sentencing body." *Id.*

Here, as in *Styers*, the State of Arizona has sentenced an individual to death without complying with the constitutional

requirement that the sentencer adequately consider "any relevant mitigating evidence." *Eddings*, 455 U.S. at 114. In both cases, the Arizona courts refused to consider the mitigating impact of PTSD evidence because the defendant failed to establish a causal relationship between the disorder and his criminal conduct. However, unlike the majority here, in *Styers* we correctly recognized that this legal error was contrary to clearly established constitutional law, and granted habeas relief accordingly. I would grant McKinney relief on the *Eddings*/*Lockett* claim. It is abundantly clear on this record that McKinney is entitled to a new sentencing proceeding in which the sentencer actually considers his PTSD diagnosis as a mitigating factor as required by the Constitution.

## V.

Whether McKinney must also demonstrate actual prejudice for the writ to issue is an unsettled question in the Ninth Circuit. Historically, we have treated *Eddings* errors as structural, granting the writ without inquiring as to the likelihood of a different sentencing result. *See, e.g.*, *Williams*, 623 F.3d 1258; *Styers*, 547 F.3d 1026; *see also Stokley v. Ryan*, 705 F.3d 401, 405 (9th Cir. 2012) (Paez, J., dissenting). However, recently a panel of our Court refused to grant the writ despite assuming that an *Eddings* error had occurred at the state level. *Stokley*, 705 F.3d at 405. Instead, the panel examined whether the petitioner could demonstrate actual prejudice under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Stokley*, 705 F.3d at 403–05. Concluding that the petitioner could not do so, the panel refused to grant the writ. *Id.* Despite this, the *Stokley* panel majority stopped well short of overruling our precedent, which, in any event, it was without the power to do. *See United States v. Parker*,

651 F.3d 1180, 1184 (9th Cir. 2011) (per curiam) ("Only the en banc court can overturn a prior panel precedent."); *see also Miller v. Gammie*, 335 F.3d 889, 892–93 (9th Cir. 2003) (holding that a three-judge panel "may reexamine normally controlling circuit precedent" only "where the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority"). As a result, *Stokley* has created an intra-circuit split concerning whether *Eddings* errors are structural or are reviewed for actual prejudice. Absent an en banc call to correct this issue, I would maintain the uniformity of our prior precedents by remaining faithful to the numerous cases that have treated *Eddings*/*Lockett* errors as structural, and not following the one outlier decision that failed to do so. *See, e.g.*, *Williams*, 623 F.3d 1258.

However, even assuming that *Eddings*/*Lockett* violations are reviewed for "actual prejudice," I would conclude that the *Eddings*/*Lockett* error in this case had a "substantial and injurious effect or influence" upon the sentencer's decision. *Brecht*, 507 U.S. at 627. The *Brecht* standard examines whether the constitutional error substantially influenced the outcome of a case:

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even

so, whether the error itself had substantial
influence.

*Merolillo v. Yates*, 663 F.3d 444, 454 (9th Cir. 2011) (quoting
*Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).
"Where the record is so evenly balanced that a judge 'feels
himself in virtual equipoise as to the harmlessness of the
error' and has 'grave doubt about whether an error affected a
jury [substantially and injuriously], the judge must treat the
error as if it did so.'" *Id.* (quoting *O'Neal v. McAninch*,
513 U.S. 432, 435 (1995)) (alteration in original) (internal
quotations omitted).

McKinney has argued that he is entitled to a new
sentencing proceeding because the sentencing judge's failure
to appropriately consider his PTSD diagnosis resulted in a
death sentence when a life sentence was called for based on
his lessened culpability. Here, McKinney's sentence was
"substantially swayed" by the sentencing judge's error.
*Merolillo*, 663 F.3d at 454. A sentencer who appropriately
considered all the relevant mitigating evidence as required by
*Lockett* could easily have concluded on the basis of Dr.
McMahon's testimony that McKinney's PTSD was a
substantial mitigating factor. Instead, the sentencing judge's
unconstitutional refusal to consider the effect of McKinney's
PTSD on his culpability for his crimes "creates the risk that
the death penalty will be imposed in spite of factors which
may call for a less severe penalty." *Lockett*, 438 U.S. at 605.
Given the significant non-PTSD mitigation evidence that
McKinney presented at sentencing, it cannot be said "with
fair assurance" that a sentencer who also appropriately
considered the PTSD evidence would have sentenced
McKinney to death. *Merolillo*, 663 F.3d at 454. I would
therefore reverse the district court and remand with

instructions to grant McKinney's habeas petition, and to require that the state court hold a new sentencing hearing within ninety days.